## HENRY L. SIMONS v. EMIL MUNCH and Others.[1]

August 4, 1911.

Nos. 17,119, 17,133—(203, 205).

**Easement to flood land — findings unsupported by evidence.**

    In an action of ejectment to recover possession of land overflowed by the backwater of a dam, where defendant claims a perpetual right of overflow, it is *held* that the conclusions of law to the effect that defendant had acquired a permanent easement to flood the lands of plaintiff by the maintenance of such dam for power purposes are not sustained by the facts.

Action of ejectment in the district court for Pine county, and to determine that plaintiff is the owner of certain land and entitled to recover $2,000 damages for the use and occupation of the same. The answer alleged that, for fifty years prior to the commencement of the action, the Chengwatonna dam had been maintained and used continuously for improving navigation and to create water power for manufacturing purposes; that the sole owner at the time of answer was the Pine City Electric Power Company; that it was using the water created by the dam for the purpose of generating electric power and improving navigation; that the stream had been improved to such an extent as to be available to the public for logging and lumbering, and was used for navigation by steamboats, gasolene launches and other water craft; that any flowage of the

[1]Reported in 132 N. W. 321.

lands mentioned in the complaint resulting from the construction and operation of the dam existed openly, continuously and adversely, during all the period aforesaid, to the claim of plaintiff, and that neither plaintiff nor others under whom he claimed as predecessors in title had been seized of the premises within fifteen years prior to the commencement of this action; that the Pine City Electric Power Company had power and authority to maintain the dam for the purposes above mentioned and that it was its purpose to acquire such right by condemnation proceedings in the event it should be determined it did not already own such right; that under Special Laws 1881, c. 38, and Special Laws 1887, c. 70, the village of Pine City for the purpose of protecting the public health had full power to regulate by ordinance or by-law the management of the dam if they deem the public health will be thereby imperiled; that the village enacted an ordinance in 1885, relating to the height of water to be maintained by the dam; that the public interest in the navigation of said river both above and below the dam and the health and well being of the community in the vicinity of Cross lake and Snake river required that the water as heretofore maintained should be continued, and that the consequent flooding of riparian lands was lawful; that an abatement of the dam would be detrimental to the health and comfort of all the people aforesaid, and result in great injury to lands riparian to said waters and create a nuisance, both public and private.

The village of Pine City also served its separate answer. The reply to the answer of the village alleged that the dam was constructed originally for the temporary purpose of a public sluice dam and since 1903 had been continued under authority of Laws 1861, c. 50, and had never been used by its owners for any other purpose and was only used by them prior to 1903 to raise the waters on the Snake river during the months of May and June in any year.

The case was tried before Wright, J., who made amended findings and ordered judgment in favor of defendants. From the judgment entered pursuant to the order interveners Swanson and others appealed; intervener Taylor appealed separately. Reversed on ap-

peal of plaintiff and allied interveners and remanded with directions. Affirmed on appeal of intervener Taylor.

*J. W. Reynolds,* for appellants Simons and allied interveners.

*Durment, Moore & Sanborn* and *J. N. Searles,* for respondents.

BUNN, J.

This is an action in ejectment to recover the possession of lands from defendants, who claim a perpetual easement therein to overflow the same, incident to the maintenance of Chengwatonna dam. The action was commenced in 1906, and was before this court in Reynolds v. Munch, 100 Minn. 114, 110 N. W. 368, where it was held that ejectment was the proper form of action, and again in Simons v. Munch, 107 Minn. 370, 120 N. W. 373, 121 N. W. 878, where a decision of the trial court in favor of defendants was reversed and a new trial granted. After the case was returned to the district court, the Pine City Electric Power Company, which had succeeded to the ownership of the dam, and the village of Pine City, were made defendants. Other owners of land within the flowage area of the dam intervened in the action, their interests being with plaintiff. Dr. H. Longstreet Taylor, owner of lands adjacent to the flowage area, also intervened. His interests are with defendants.

The trial resulted in a decision in favor of defendants; the trial court holding that defendant Pine City Electric Power Company now owns a perpetual easement in the lands of plaintiff and the allied interveners to flood said lands with water backed up and cast upon said lands by reason of the maintenance by said defendant of the Chengwatonna dam across Snake river, and that intervener H. Longstreet Taylor was not entitled to relief. Motions for a new trial were denied, and judgment was entered on the decision. Plaintiff and allied interveners appealed from the judgment, as did intervener Taylor.

The main question on this appeal is whether the original defendants had acquired, prior to the commencement of this action, a perpetual easement to flow the lands of plaintiff and allied interveners by the waters backed up and cast upon said lands by the maintenance of Chengwatonna dam. This easement is claimed by

adverse possession or prescription. A second question is as to the power of the village of Pine City under existing legislation to regulate the head of water on the dam, and whether defendants can claim any rights to flow the lands under the village's attempted exercise of such power.

The solution of these questions involves, first, a clear understanding of the facts; second, a consideration of the law applicable to such facts.

The Chengwatonna dam has been a prolific source of litigation. Its history may be gathered by a reference to the decisions of this court in which it has figured. Anderson v. Munch, 29 Minn. 414, 13 N. W. 192; Village of Pine City v. Munch, 42 Minn. 342, 44 N. W. 197, 6 L.R.A. 763; Swan v. Munch, 65 Minn. 500, 67 N. W. 1022, 35 L.R.A. 743, 60 Am. St. 491. It is well, however, to give here a brief résumé of the history of the dam and the material facts which we consider established by the admissions of the parties and the evidence.

Snake river is a meandered stream navigable in its natural state for logs and lumber. It arises in Aitkin county and flows in a southeasterly direction through the counties of Kanabec and Pine into the St. Croix river. In its course through Pine county it flows through the limits of defendant village of Pine City. It also flows through Cross lake. a meandered body of water about one and one-half miles down the river from Pine City. About five miles above Pine City lies Pokegama lake, which is connected with Snake river by a small creek. The lands adjacent to the river for some twelve miles upstream from Cross lake are low and flat for an average distance of a half mile on either side of the river in its natural condition. The current of the river for this distance, while sufficient for drainage, was slow and sluggish, except during the usual spring freshets, when it overflowed the adjacent lowlands. From Cross lake to the St. Croix, a distance of eight miles, the bed of the river is obstructed by rocks and boulders, and the driving of large quantities of logs down the river, both above and below Cross lake, is impracticable as a business proposition without the aid of dams. The territory tributary to Snake river was originally covered with

merchantable timber, and since 1843 lumbering operations have been carried on in such territory.

Chengwatonna dam was constructed across Snake river at the outlet of Cross lake in 1849 or 1850 by Elam Greely under an act of the territorial legislature approved October 20, 1849 (Laws 1849 p. 90, c. 31). The material portions of this act are as follows:

"Be it enacted by the Legislative Assembly of the territory of Minnesota, that Elam Greely, his heirs, executors, administrators and assigns, be and hereby are authorized to build a dam across Snake river, near the outlet of Cross lake, and to keep up and maintain the same for the term of twelve years: Provided, that nothing in this section contained shall preclude the Legislative Assembly, after the lapse of six years, from altering or repealing this act, whenever it shall be deemed consistent with the public interest to do so.

"Sec. 2. That the said dam shall be sufficiently high to raise the surface of the said Cross lake at least five feet and six inches above low-water mark. That the dam shall be provided with the necessary gates and sluices, and all the other appurtenances necessary for sluicing logs, and be ready to sluice logs on the first day of April, one thousand eight hundred and fifty.

"Sec. 3. That the said Elam Greely shall sluice all logs upon the requisition of the owner or owners thereof, commencing to sluice within five days after the logs have arrived in the boom belonging or attached to said dam: Provided, that the owner or owners of said logs, or their accredited agents, shall have tendered him the legal toll or security for the same; and for any violation of this section, the said Elam Greely shall be responsible to the owner or owners of said logs, for any damages sustained, to be recovered in any proper action or suit, in any court of competent jurisdiction.

"Sec. 4. That the said Elam Greely shall be bound in the like penal sum to open all the gates of said dam, or such a number thereof, as shall be found to afford sufficient water to drive logs between the dam and the mouth of Snake river, upon the requisition of the owner or owners of such logs as have been sluiced, for and during at least four days after the last logs of the number that were intend-

ed to be sluiced at the same time shall have passed the dam: Provided, that he shall reserve the right to shut the gates at sundown, raising them again one hour before sunrise.

"Sec. 5. That the said Elam Greely shall be entitled to collect by law a toll on all logs passing the dam: Provided, that such toll shall not exceed the sum of ten cents, for the first year, for every thousand feet of lumber in logs, and six and one-fourth cents per thousand thereafter, taking the scale in common use on the St. Croix river, as a guide; such toll, in case of default of payment, to be collected under an action for debt.

"Sec. 6. That said dam [is] to be supplied with a chute, with such an inclination, that fish may pass freely up and down the river.

"Sec. 7. That the sluices of said dam shall remain open (after all the logs to be sluiced that season shall have been sluiced) until such time as it may be found necessary to close them, in order to fill the dam preparatory to the next spring drive.

"Approved the twentieth day of October, one thousand eight hundred and forty-nine."

The dam as originally constructed was built of timbers with a series of sluice gates extending straight across the river. While it was practically rebuilt in 1877, and repaired at various times, its character has remained unchanged up to the time of the trial. From 1877 to 1903 the maximum capacity of the dam was a head of water nine and one-half feet on the floor of the sluice gates, from 1903 to 1909 its maximum capacity was six feet, and since 1909 it has been seven feet. From 1849 to 1903 the owners of the dam used it and the waters of Snake river collected by it each year for the purpose of sluicing logs of various owners cut in the vicinity of the river and brought down to and through the dam by their owners, and supplying the owners of such logs with sufficient water to float them into the St. Croix river. Such operations extended over the months of April, May and June in each year. The dam was maintained under the act of 1849 until 1861; after that time, until 1897, as a licensed public sluice dam for toll, under the pro-

visions of chapter 50, p. 173, Laws 1861. In 1897 the county commissioners refused a further license, and the dam was maintained thereafter without a license.

Until 1877 or 1878 the sluice gates of the dam were opened after the sluicing season each year, and remained open until the spring of the following year. From 1878 up to the time of the trial, with the exception of times when the gates were opened temporarily, or when repairs were being made, the gates were kept closed throughout the year, and the lands flowed by the backwater of the dam were overflowed, not only during the sluicing season, as had been the case before, but all the time. The water covered the lands of plaintiff and the interveners allied in interest with him, and formed a pond or lake which was used for boating, and also for logging by the owners of mills operated at different times at Pine City. The owners of the dam never made any beneficial use of this body of water, except during the sluicing season for sluicing logs through the dam and furnishing water to carry them to the St. Croix. During the months other than April, May, and June, the owners of the dam received no pecuniary benefit from their occupancy of the overflowed lands.

This is true, except that from 1855 to 1878 the owners of the dam maintained and operated a small mill. This mill was used for various purposes at intervals of time—at one time for sawing logs, at another time for grinding corn and feed, and again for sawing shingles. It was operated by water power supplied by the dam, not continuously, but on occasions. At times it would be used, but at times it was not operated for two or three years. The mill ceased to be used for any purpose in 1878 or 1879, and in 1880 was torn down. Except in the operation of this small mill, the waters collected by the dam were never used by its owners for power purposes until the defendant Pine City Electric Power Company purchased the property in 1909.

The village of Pine City was incorporated as a village under chapter 38, p. 228, Sp. Laws 1881. By chapter 16, p. 118, Sp. Laws 1885, as amended by chapter 70, p. 652, Sp. Laws 1887, the village was authorized to regulate and control by ordinance the man-

agement of all dams, wherever located, which caused lands in or contiguous to the village to be overflowed, and was given power to declare such a dam a public nuisance and to abate the same. The 1887 amendment added a proviso that the act should not be construed to give the village council any authority to prevent the drawing of the head of water from a dam down to five feet any time prior to July 1, or down to six feet prior to July 15, after July 1, in each year.

On June 20, 1885, the village council of Pine City adopted an ordinance fixing the minimum stage of water at seven feet, and provided a penalty of fine or imprisonment for any person who should open any gates in the dam while the water was at a depth of seven feet or less. Afterwards the ordinance was amended so as to fix the minimum head of water at six feet after July 15 in each year.

The village of Pine City reincorporated under the general village law of the state in 1908.

In 1905 the intervener Taylor became the owner of land situated near the southerly end of Pokegama lake and adjacent to the shores of Snake river, and constructed on these lands a large sanatorium. His property would be greatly diminished in value, should the dam be removed or destroyed. In 1903 the dam ceased to be used for sluicing logs, because there were no more logs to sluice.

The above is an outline of the material facts, taken largely from the trial court's findings. Applying the law to these facts, we hold that the following propositions are established and may be taken as the basis upon which we are to discover and determine the ultimate question in the case.

1. Neither Elam Greely nor his successors ever acquired by grant of the legislature the right to maintain a dam for power purposes, or to create a head of water to improve the navigability of Snake river for logging and lumbering. Their only right, given by the act of 1849 or the laws of 1861, was the right to construct and maintain a dam for sluicing logs for toll and to furnish water to enable the log owners to drive to the St. Croix. The act of 1849 expressly provided that the sluices of the dam should remain open after the sluicing season until such time as it might be found neces-

sary to close them in order to fill the dam preparatory to the next spring drive. Chapter 50, p. 173, Laws 1861, did not contain this provision requiring the sluices to remain open after the sluicing season was over, but simply authorized the granting of licenses to construct and maintain dams to sluice logs for toll.

2. Chengwatonna dam was constructed and maintained as a sluice dam. It was never used to create a head of water for any other purposes beneficial to its owners. Until 1877 or 1878 the sluice gates were opened after the sluicing season and remained open as provided by the act of 1849. After 1878 the gates were generally kept closed after the last of the logs were sluiced. The use of the head of water for the small mill from 1855 to 1878 was not a use of the body of backwater created by the dam that could form the basis of any claim of right by adverse possession to flow the lands. It is clear that this was a merely incidental use, and was not a use at all of a head of water held contrary to the grant, because it is found that the gates were kept open until 1877 or 1878 at all times except during the sluicing season. It appears conclusively that the owners of the dam never made any beneficial use of the flowage. That others used it for logging purposes or boating does not constitute a beneficial use that can be of aid in determining the rights of defendants. Granting that such a use for the statutory period would confer a permanent right upon the users, they are not here claiming such right.

3. We are of the opinion that the ordinances of the village of Pine City in no way affect the issues in this case, except as the attitude of the village may explain the otherwise unexplained continuous maintenance of the head of water. If the act of the legislature under which the ordinances were passed gave the village power to transform a temporary easement to flood plaintiff's lands into a permanent right, such act is unconstitutional, because its effect was to deprive the owner of the servient estate of his property without compensation. But the act need not be so construed. It conferred merely power on the village to *regulate and control* dams, to declare them nuisances, and to abate them. It gave no authority to compel the dam owners to maintain the dam or the flowage for

a time or purposes beyond those specified in the laws which authorized its maintenance. Certainly it gave no authority to the village to prohibit the dam being removed, and no authority to confer rights or powers on the owners that they did not have under the laws. Indeed, the last attitude of the village seems, from the brief and argument of its counsel in this court, to be in favor of the abatement of the dam.

4. The sluicing of logs ended in 1903. It is apparent that the use for which the dam was authorized, constructed, and maintained ended in 1903. That there is still a tract of timber near the headwaters of the Snake river does not conflict with this statement. It seems entirely fair to say that such timber will never be taken down the river through the dam and into the St. Croix. It will be either manufactured into lumber in mills in its vicinity or the logs will be taken to market by rail.

It follows from the propositions above decided that the remaining and decisive question is this: Does the flowage of plaintiff's lands by defendants and their predecessors, from 1878 to the commencement of this action, give the owners of the dam a perpetual easement to flow such lands? Stated in other words: Does the fact that the owners of the dam, for no purpose beneficial to them, kept the head of water and covered the lands throughout the time, give them a perpetual easement of flowage? Defendants have no such easement, unless they have acquired it by prescription. Where an easement is acquired for a public use, and that use ceases or is abandoned, the easement ends.

Any flowage that was the result of maintaining the dam for sluicing purposes, as authorized by either the act of 1849 or the law of 1861, cannot be made the basis of a claim of a permanent prescriptive right of flowage by the use of the dam for power purposes. It is true that these laws did not and could not authorize the owners of the dam to flood the lands of plaintiff and the allied interveners; in other words, the flooding of the land was originally a trespass, for which its owners could recover damages. This is so, because the legislature could not confer a right to flood the lands without compensation to the owners. It cannot be questioned that each

115 M.—24.

owner of land flooded had a right to recover of the owners of the dam the amount of damages sustained to his land, providing he brought his action before it was barred by the statute of limitations. But if he permitted the flowage of his lands for the statutory time, the owners of the dam acquired the right by prescription. Swan v. Munch, 65 Minn. 500, 67 N. W. 1022, 35 L.R.A. 743, 60 Am. St. 491.

However, the extent of the flowage right thus acquired, whether a permanent right or a temporary right, depends upon the character of the user, and the purpose of the flowage. This must be determined by the claim of right under which the owners of the dam flowed the lands, and the character of this claim is determined by the laws under which the dam was constructed and maintained. The laws authorized a dam for sluicing logs; the law of 1849 granted the right for twelve years; the act of 1861 authorized county commissioners to grant licenses for six-year periods. Both from the limited time for which the right was granted, and from the character of that right, it is apparent that it was temporary. It follows that the prescriptive right to flood plaintiff's lands was not a permanent right, but one that would terminate when the purpose of the user was at an end. When there were no more logs to sluice, the easement ended, unless another and permanent easement had been acquired by prescription in the meantime.

What is said on this point in the original opinion in Simons v. Munch, 107 Minn. 370, 120 N. W. 373, 121 N. W. 878, conflicts with the opinion on the reargument, and is not the law of this state. It was in effect held by the latter opinion that, if the easement acquired was limited to the sluicing of logs, plaintiff was entitled to prevail in this action; but the court said that the evidence was not conclusive that the easement acquired was so limited, and granted a new trial in order that it might be determined whether the logging and lumbering carried on above the dam prior to 1903 was a mere incident to the sluicing of logs, or an independent business with reference to which the dam was erected, and maintained.

The cases relied on by defendants are all cases where the change in user did not amount to a change from a temporary purpose to a

permanent one. This we regard as the crucial point of distinction. We have here an easement for a limited time, a temporary use, and a claim of a prescriptive right to an easement for all time, a permanent use. If a right is acquired by prescription to permanently maintain a dam to run a sawmill, and the owner changes it to a gristmill, it is reasonable to say that the change does not work an abandonment. There has been no change in the extent of the easement or the injury done by the backwater, and no increase of the burden upon the servient estate. There is no case cited to us which does not rest upon the proposition that the burden upon the servient estate is not changed by the use of the easement for a different purpose, and no case where the doctrine is applied to a change that does increase the burden or extend its duration. See note to Avery v. Vermont (Vt.) 59 L.R.A. 817; Whitehair v. Brown, 80 Kan. 297, 102 Pac. 783, 18 Am. & Eng. Ann. Cas. 216, and note.

We hold that a right acquired by prescription to flood lands by the backwater of a dam constructed and maintained solely for the temporary purpose of sluicing logs ends when the purpose ends, and does not give a prescriptive right to flood the lands permanently by the use of the dam for other purposes. While it is the law, as stated in Swan v. Munch, that the right of the landowners to recover damages caused by the flooding of their lands was barred by the statute of limitations, and that their lands were subject by prescription to an easement of flowage for certain months in each year during the sluicing season, it is clear that the owners of the land flooded never possessed the right to have the dam abated so long as it was used for sluicing logs. The dam was authorized by law, and the only right the landowners had was the right to recover compensation for the injury to their lands. It is impossible to see how their inaction could confer greater rights than those then claimed by the proprietors of the dam. They might have been willing to submit without compensation to a temporary flooding of their lands, knowing that the easement would end in time, but unwilling to acquiesce in a permanent easement.

This leaves only the question of whether defendants have acquired by prescription an easement to maintain the head of water

for power purposes or any permanent use. They kept up the head of water and flowed plaintiff's lands practically continuously from 1878 to 1893, according to the findings; but, as we have held, they made no use of the water. We think it is the law, and so hold, that in so far as this flowage was not reasonably necessary in order to sluice logs and furnish water to drive them to the St. Croix, it was not a user of the servient estate that could confer a prescriptive right different in character and duration from that originally possessed. A user of the servient estate, unless clearly and openly inconsistent with and adverse to the easement, must be presumed to be a user under the easement originally acquired, and cannot be made the basis of a prescriptive right to a new easement. Under this rule, we think that some user of the servient estate other than keeping it covered with water is necessary to create a prescriptive easement to keep it covered for all time. There must be some beneficial use in order to sustain the claim that the possession is adverse and hostile, under claim of right. It is difficult to conceive of an easement acquired in land by prescription, where there is not a beneficial user of the servient estate, because in almost every conceivable case the fact that the possession necessary to create the prescriptive right has existed means that there has been a beneficial user.

Possession is use generally. But in this case we seem to have possession or occupancy without use. The possession of plaintiffs' lands was either wanton, or because it was less trouble to keep the head of water constantly, or because the village of Pine City demanded that the sluice gates be kept closed. There was not only no use of the head of water or the flowage by the owners of the dam, but no acts that evidence an intention to make use of either in the future. The deeds in the chain of title to the land on which the dam was constructed do not show an intention to use the dam for power purposes, but only indicate a claim of right to do so, which claim had no basis in law. A mere claim of right, unaccompanied by any acts showing an exercise of the right, or at least an intention to exercise it in the future, is insufficient to show user or intended user. The occupancy of plaintiffs' land is more readily explained by the insistence of the village that the flowage should be main-

tained than it is by the theory that the owners of the dam intended to make some beneficial use of the water in the future. We hold that beneficial user is necessary to create an easement by prescription, whether it be an easement to flood the lands of another, or of any other character. And this user must have been substantially continuous. This is in effect the decision of this court on the re-argument in this case on the former appeal.

We hold, then, that the conclusions of law of the trial court to the effect that the defendant Pine City Electric Power Company owns a perpetual easement to flood the lands of plaintiff and the interveners allied in interest with plaintiff is not sustained by the findings of fact, and that such findings compel the conclusion that said defendant has no easement to flood said lands.

Judgment reversed on appeal of plaintiff and allied interveners, and case remanded, with directions to the trial court to amend its conclusions of law in accordance with this opinion and to order judgment accordingly.

Affirmed on appeal of intervener Taylor.

LEWIS, J., absent, took no part.