ANTON HANSON v. FERGUS FALLS NATIONAL BANK &
TRUST COMPANY AND OTHERS.
H. G. DAHL, RESPONDENT.[1]

July 23, 1954.

No. 36,148.

---

[1]Reported in 65 N. W. (2d) 857.

*Henry Nycklemoe,* for appellant.
*Rosengren & Rufer* and *Robert O. Blatti,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

The material facts in this case are not seriously in dispute. The action was brought to quiet title to a parcel of land in Otter Tail county containing about 134 acres. The land originally was patented by one Stengrim Hanson. On October 22, 1925, he executed a mortgage thereon to the Fergus Falls National Bank and Trust Company. Hanson died in 1931. On March 19, 1932, the bank bid the land in at a foreclosure sale of the above mortgage for $4,961.06 and secured a sheriff's certificate of sale.

At the time of the foreclosure sale, Ole S. Bergerud, a son of Hanson, was in possession of the farm. He made a demand upon the sheriff that the farm be sold in separate parcels, which was done. March 19, 1933, which would have been the last day for redemption, fell on a Sunday, so the time for redemption expired on March 20, 1933. On that date, the Fergus Falls National Bank and Trust Company, as vendor, and Ole S. Bergerud, as vendee, entered into a contract for deed in the usual form under the terms of which the bank agreed to sell the farm to Bergerud for $5,258.72, the amount for which the land was bid in at the foreclosure sale plus interest to the date of the contract, all of which was to be payable on October 1, 1933. The contract contains a reservation reading: "All hunting rights are reserved by vendor * * *."

Ole S. Bergerud made an application to the Federal Land Bank of St. Paul for a loan which was dated sometime prior to November 14, 1933. The application was approved for a loan of $4,200. On November 14, 1933, the president of the Fergus Falls National Bank and Trust Company wrote to the treasurer of the Federal Land Bank asking to have the loan approved for a larger amount, which was refused. On November 28, 1933, the Fergus Falls National Bank and Trust Company executed a quitclaim deed of the premises

to Bergerud, who thereupon executed a first mortgage to the Federal Land Bank to secure the sum of $2,800 and a second mortgage for $1,400 to the Land Bank Commissioner, both dated December 1, 1933. The quitclaim deed and both mortgages were duly recorded on December 30, 1933. The Fergus Falls bank received and accepted the net proceeds of the loan as payment in full. In the quitclaim deed from the Fergus Falls bank was the following reservation:

"Reserving However To The Fergus Falls National Bank And Trust Company, *Or Assigns* All Shooting And Hunting Privileges Together With The Right Of Passage Or Travel Over For The Purpose Of Hunting During Hunting Seasons." (Italics supplied.)

On December 6, 1935, the Fergus Falls National Bank and Trust Company executed an assignment which reads as follows:

"For Value Received, Fergus Falls National Bank and Trust Company a Corporation, does hereby assign all their right, title and interest in the shooting and hunting privileges, together with the right of passage or travel over for the purpose of hunting during the hunting seasons, * * * unto H. G. Dahl and J. S. Ulland, their heirs and assigns, Forever."

The consideration actually paid for this assignment was one dollar.

After the death of Ulland, his heirs executed an assignment reading as follows:

"For value received, I, * * * do hereby assign all my right, title and interest in the shooting and hunting privileges, together with the right of passage or travel over for the purpose of hunting during the hunting seasons, * * * unto H. G. Dahl, his heirs and assigns, forever."

On April 19, 1937, the Federal Land Bank foreclosed its mortgage and became the owner of the land a year later. In 1938, the Federal Land Bank sold the farm to plaintiff on a contract for deed. Plaintiff thereafter complained to the Federal Land Bank about the hunting reservation, as the result of which the Land Bank entered into negotiations with the Fergus Falls National Bank and Trust Com-

pany. At the conclusion of these negotiations, the Federal Land Bank credited plaintiff's account with $1,000. He in turn agreed to "take these hunting rights over." On July 20, 1943, the Federal Land Bank executed a limited warranty deed to plaintiff "Subject to all existing easements and rights of way." In order to pay the bank, plaintiff procured a loan of $3,500 from the Prudential Life Insurance Company and executed a mortgage to that company on the premises for that amount, which mortgage is subject to the reservation of record held by Dahl. Again in 1949, plaintiff executed a mortgage, subject to the reservation, to Prudential Life Insurance Company.

The case was tried to the court without a jury. The court found in effect that the quitclaim deed from the Fergus Falls National Bank and Trust Company reserved a valid easement; that plaintiff accepted and retained the sum of $1,000 from the Federal Land Bank on account of the hunting reservation, which sum plaintiff accepted and retained with the understanding that the real estate would remain subject to and be encumbered by the reservation; that plaintiff recognized the validity of the reservation in mortgages and instruments which he executed and which were recorded in the office of the register of deeds; that for more than 18 years plaintiff, with full knowledge that the reservation was in existence and recorded against the land and with full knowledge that rights were claimed by Dahl and Ulland thereunder, did nothing to question the reservation and at all times recognized the same; that by reason thereof, even if plaintiff had any right to attack the reservation, he had lost the same both by laches and by permitting the statute of limitations to run against him; and that the reservation and easement are legal and binding, run with the land, and are assignable. The court ordered title quieted in Dahl as to said easement and reservation. Judgment was entered, and this appeal is from such judgment.

■ The first contention of plaintiff is that, when the Fergus Falls National Bank and Trust Company and Bergerud executed the contract for deed on March 20, 1933, the time for redemption had not expired; that the bank was not then the owner of the land; that

502

the contract for deed was intended as an extension of the time for redemption from the foreclosure sale; and that, as a consequence, the bank could not reserve the hunting rights since it never became the owner of the land.

There are several reasons why this position is not tenable. We have no doubt that the parties could have extended the time for redemption had they desired to do so (Tice v. Russell, 43 Minn. 66, 44 N. W. 886), in which case the ownership of the property would have remained as it was. The difficulty in this case is that, even if we were to so hold, the extended time at best would have expired on October 1, 1933, the date specified for payment under the contract. It is further clear that redemption was never made by Bergerud but that he took title under a deed, not under a certificate of redemption.

■ Plaintiff next contends that the interest created by the reservation involved in this case is not such as can be held or owned by a banking corporation. We disagree with that contention, as it is our opinion that it can.

The almost universal holding from early times has been that the right to hunt on the premises of another is an incorporeal right designated as a "profit a prendre." Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222; Davies's Case, 3 Mod. 246; Wickham v. Hawker, 7 Mees. & W. 62; Ewart v. Graham, 7 H. L. Cas. 331; Bingham v. Salene, 15 Ore. 208, 14 P. 523, 3 A. S. R. 152; Salene v. Isherwood, 55 Ore. 263, 106 P. 18; Isherwood v. Salene, 61 Ore. 572, 123 P. 49, 40 L.R.A.(N.S.) 299, Ann. Cas. 1914B, 542; State v. Mallory, 73 Ark. 236, 83 S. W. 955, 67 L. R. A. 773; St. Helen Shooting Club v. Mogle, 234 Mich. 60, 207 N. W. 915; Council v. Sanderlin, 183 N. C. 253, 111 S. E. 365, 32 A. L. R. 1527; 17 Am. Jur., Easements, § 6; Annotation, Ann. Cas. 1914B, 545. A profit a prendre is defined as a right exercised by one man in the soil of another, accompanied with participation in the profits of the soil thereof, or a right to take a part of the soil or produce of the land. Black, Law Dictionary (3 ed.) p. 1440; 17 Am. Jur., Easements, § 6; 28 C. J. S., Eastements, § 3f. A profit a prendre, like an easement, may be appurtenant or in gross. 17 Am. Jur., Easements,

§ 6. When it is appurtenant, it may not be severed from the dominant estate but passes with it. It is considered an interest in land and is within the statute of frauds. 28 C. J. S., Easements, § 3f; Webber v. Lee [1881] 9 Q. B. D. 315, 51 L. J. Q. B. 485; Annotation, Ann. Cas. 1914B, 545; Bingham v. Salene, 15 Ore. 208, 14 P. 523, 3 A. S. R. 152. A profit a prendre in gross may be assignable or inheritable. Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222; 28 C. J. S., Easements, § 3f.

The rule in England is that an easement in gross, if it exists at all, may not be assigned. Ackroyd v. Smith, 10 C. B. 164; 38 Yale L. J. 141; 22 Mich. L. Rev. 521; see, Restatement, Property, § 450, special note, p. 2901. The weight of authority in this country also follows the same rule, although there is authority to the contrary, and the nonassignability of easements in gross has been severely criticized by some authors. 17 Am. Jur., Easements, § 11; 28 C. J. S., Easements, § 4b; Annotation, 130 A. L. R. 1254; 38 Yale L. J. 141; 22 Mich. L. Rev. 521; see, Restatement, Property, § 491. While the trial court found that plaintiff had an easement, we need not determine whether we will follow the rule that easements in gross are nonassignable, which seems to be an open question in this state, for the reason that we are already committed to the rule that the interest which plaintiff has, if any, is a profit a prendre in gross, not an easement in gross, strictly speaking. Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222. In dealing with this subject the Restatement treats easements and profits alike, as easements. Restatement, Property, § 450, special note, p. 2901.

The doctrine that the right to hunt on another's land is a profit a prendre had its origin in the early English cases and was based on the theory that the owner of the land had a property right in the wild animals. Davies's Case, 3 Mod. 246; Wickham v. Hawker, 7 Mees. & W. 62; Ann. Cas. 1917B, 958. In Ewart v. Graham, 7 H. L. Cas. 331, 344, Lord Campbell said:

"* * * The property in animals, *ferae naturae*, while they are on the soil, belongs to the owner of the soil, and he may grant a right to others to come and take them by a grant of hunting, shooting,

fowling, and so forth; that right may be granted by the owner of the fee simple, and such a grant is a license of a *profit a prendre.*"

In discussing this subject, Lord Westbury in Blades v. Higgs, 11 H. L. Cas. 621, 631, said:

"* * * when it is said by writers on the Common Law of England that there is a qualified or special right of property in game, that is in animals *ferae naturae* which are fit for the food of man, whilst they continue in their wild state, I apprehend that the word 'property' can mean no more than the exclusive right to catch, kill, and appropriate such animals which is sometimes called by the law a reduction of them into possession.

"This right is said in law to exist *ratione soli,* or *ratione privilegii,* for I omit the two other heads of property in game which are stated by Lord Coke, namely *propter industriam* and *ratione impotentiae,* for these grounds apply to animals which are not in the proper sense *ferae naturae.* Property *ratione soli* is the common law right which every owner of land has to kill and take all such animals *ferae naturae* as may from time to time be found on his land, and as soon as this right is exercised the animal so killed or caught becomes the absolute property of the owner of the soil.

"Property *ratione privilegii* is the right which, by a peculiar franchise anciently granted by the Crown in virtue of its prerogative, one man had of killing and taking animals *ferae naturae* on the land of another; and in like manner the game, when killed or taken by virtue of the privilege, became the absolute property of the owner of the franchise, just as in the other case it becomes the absolute property of the owner of the soil."

The early cases in this country proceeded on a similar theory. In Bingham v. Salene, 15 Ore. 208, 213, 14 P. 523, 525, 3 A. S. R. 152, the court said:

"* * * As the owners of the lands which included such lakes, sloughs, and waters thereon, the property of animals *ferae naturae,* while on the lands or such waters, belonged to the defendants."

In State v. Mallory, 73 Ark. 236, 248, 83 S. W. 955, 959, 67 L. R. A. 773, in an exhaustive review of the authorities on this subject, the court said:

"* * * the owner of land has a right to take fish and wild game upon his own land, which inheres to him by reason of his ownership of the soil. It is a property right, as much as any other distinct right incident to his ownership of the soil. It is not, however, an unqualified and absolute right, but is bounded by this limitation, that it must always yield to the State's ownership and title, held for the purposes of regulation and preservation for the public use. * * *

"* * * the right of the landowner to hunt and fish on his own lands is to that extent a special property right, though subordinate to the other."

In Schulte v. Warren, 218 Ill. 108, 121, 75 N. E. 783, 786, 13 L.R.A.(N.S.) 745, the Illinois court said:

"* * * There is no private ownership of wild game, but the exclusive right of every owner of land to kill and take game found from time to time on his land is indisputable. This was regarded at common law as property *ratione soli,* or, in other words, as property by reason of the ownership of the soil. While there can be no absolute property in animals *ferae naturae* while at liberty in their natural state, they become the property of the owner of the soil when killed or captured thereon, and the right to kill or capture them is exclusive in such owner. Whenever the owner's right is exercised, the animal killed or captured belongs absolutely to him, and he has a qualified property in game while on his own land. The title to wild game and birds in this State is in the State, as representing all the people, both by common law and by statute. But this is only true so far as such wild game or birds are capable of ownership. The ownership, such as it is, is not that of a proprietor, but of a trustee for the benefit of all the people in common. The general ownership is in the State for the use of the public, but when wild game or fowl are upon the private grounds of an individual a qualified or special right of property of the individual attaches to it,

with the exclusive right to hunt, kill or capture while there. \* \* \* The law does recognize a qualified right of property in wild animals or birds as between the owner of the land on which they are found and a trespasser thereon."

It is the exclusive right of the possessor of land to hunt and reduce to possession the wild game thereon or in close proximity thereto, which supports the theory that such a right is a profit a prendre. In a discussion of this matter in Restatement, Property, § 450, *comment g,* we find the following statement:

"An easement may include the privilege to acquire, by reduction to possession, ownership of some substances or things which, were it not for the easement, could be appropriated only by the possessor of the land subject to the easement. \* \* \* Included among such things are those wild birds and wild animals which have not been appropriated and which are in general open to appropriation. If such things come within the space possessed by a possessor of land, his right of exclusive occupation of the land enables him to prevent, for the time being, an appropriation by others. Subject to such paramount authority as may be asserted by the state, he not only has this power to prevent appropriation by others, but an attempt at appropriation by others may be rendered ineffective by his right to claim the benefit of the attempt. Thus, if B, a trespasser, shoots wild game upon land possessed by A, A may claim the game or recover damages for its conversion. An interest which privileges one who is not in possession of certain land to make appropriations on it which, were it not for the existence of the interest, the possessor of the land could prevent is an easement."

It must be remembered that the Restatement deals with easements, as they were commonly understood in the common law, and profits alike, as easements. See, Restatement, Property, § 450, special note, p. 2901.

The rule laid down in 38 C. J. S., Game, § 4, is that the right of hunting on another's land may be acquired by grant or lease from the owner, either with or without an interest in other land, and

with such limitations as the owner may see fit to impose. A similar rule is laid down in 12 R. C. L. 689.

Summarized, the right of hunting on premises is an incorporeal right growing out of the soil, referred to in law as a profit a prendre, and may be segregated from the fee of the land and conveyed in gross to one having no interest or ownership in the fee, and when so conveyed it is assignable and inheritable. St. Helen Shooting Club v. Mogle, 234 Mich. 60, 207 N. W. 915, and authorities cited therein.

A reservation of a right to hunt over lands granted to another, if owned separate and distinct from ownership of the land, has the character of an estate in the land and may be assigned or inherited. Council v. Sanderlin, 183 N. C. 253, 111 S. E. 365; St. Helen Shooting Club v. Mogle, 234 Mich. 60, 207 N. W. 915; Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222; 12 R. C. L. 689, 690; 38 C. J. S., Game, § 4.

We are here concerned with what defendant bank retained or acquired by its reservation. It is contended in effect that it acquired no interest because it could not benefit from or use the right it reserved, since it could not shoulder a gun and hunt, and because hunting is foreign to the purpose for which the corporation exists. While this may be true, it does not follow that it may not segregate and own valuable property interests. In our opinion, the privilege of owning property interests is not dependent upon the ability to exercise the rights conferred. If it were, the result probably would be that loaning corporations would not be willing to extend credit secured by property interests if they were not authorized to exercise the particular rights involved. This could eliminate the extension of credit on all profits a prendre, i.e., sand, ice, timber, oil, gas, coal, and minerals of all kinds, unless the lending corporation was organized for the purpose of exercising the rights and thereby was able to derive direct benefit from such exercise. This would be a serious limitation to place upon such interests—a limitation which cannot be imposed without sound reason and precedent.

Whether or not the corporation exceeded its authority is not a consideration as plaintiff has no standing to question the transaction

as *ultra vires*. 19 C. J. S., Corporations, § 1112; 13 Am. Jur., Corporations, § 780. It must be noted, however, that the bank acquired the interest by foreclosure, which it is authorized to do. Rev. Stat. § 5137, 12 USCA, § 29; Crowe v. Gary State Bank (7 Cir.) 123 F. (2d) 513. Its manner of disposing of it was simply by conveyance of two estates rather than the entire fee.

It appears established that the reservation in question, if valid, was a profit a prendre in gross; that it may be segregated from the fee of the land and conveyed in gross to one having no interest or ownership in the fee; and, when so conveyed, it is assignable and inheritable. St. Helen Shooting Club v. Mogle, 234 Mich. 60, 207 N. W. 915. It also appears that no valid reason has been shown why defendant bank could not segregate the estate which conferred the right to go upon the land and reduce wild game to possession and subsequently assign it to Dahl and Ulland, who were both hunters. In this state there are many farms where the hunting rights are worth more than the land itself; and, if farmers are to be deprived of the right to sell or lease hunting rights to any corporation or to borrow money upon those rights at a bank, it would result in a most serious detriment to such landowners. In the instant case, defendant bank could have segregated the mineral estate and assigned it to a mining company, or it could have segregated and assigned the timber rights to a lumber company, the oil rights to an oil company, or the sand and gravel rights to a construction company. Sound policy leads to the conclusion that it may do so. It therefore does not follow that a corporation may not own any one of these estates, all identical in legal classification, because it is not engaged in one of those businesses. As already suggested, this fact raises only the issue of *ultra vires* acts of a corporation.

The contention that a banking corporation may not hold title to a profit a prendre was rejected in Meyers v. Central Nat. Bank, 183 Okl. 231, 80 P. (2d) 584. There, the bank acquired the interest as partial payment on a note previously given to the bank, and the court held that the bank had a valid title to oil and gas rights as against the contention that a bank is not permitted to hold realty

on the ground that a bank is permitted by statute to purchase, hold, and convey realty where it is acquired in satisfaction of debts previously contracted in the course of its business. In that case the bank did not directly benefit by the exercise of the rights involved nor was there any provision for individuals to be benefited by the exercise. It was simply regarded as a valid estate which the bank had a right to own and sell. In both the Meyers case and the instant case, the banks acquired the interests in satisfaction of debts, which they were authorized to do.

That the decision in the Meyers case applies with equal force to hunting rights is shown by the language of the same Oklahoma court in Rich v. Doneghey, 71 Okl. 204, 206, 177 P. 86, 89, 3 A. L. R. 352, where, speaking of oil and gas rights, the court said:

"* * * The right so granted or reserved, and held separate and apart from the possession of the land itself, is an incorporeal hereditament; or more specifically, as designated in the ancient French, a profit a prendre, *analogous to a profit to hunt and fish on the land of another.*" (Italics supplied.)

See, also, Miller v. Lutheran Assn. 331 Pa. 241, 200 A. 646, 130 A. L. R. 1245.

From what has been said, there seems to be no good reason why a profit a prendre may not be owned by a bank in the same manner as it may own other real property interests even though it does not intend directly to exercise the rights conferred. That being so, did the bank have an interest or profit it could assign to Ulland or Dahl? It is our opinion that it had and that such interest was assignable. Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222.

In view of our conclusion that defendant bank had the power to reserve these hunting rights and to assign such rights to Ulland and Dahl, it becomes unnecessary, in affirming the judgment quieting title to said easement and reservation in Dahl, to pass upon the validity of the trial court's additional findings that, even if plaintiff had any right to attack said reservation and easement, the same was fully compromised and settled with the Federal Land Bank and is

barred by the statute of limitations. Moreover, the question of what is a reasonable use of the hunting rights reserved is not before us.

For the reasons stated, the judgment appealed from should be affirmed.

Affirmed.

KNUTSON, JUSTICE (dissenting).

I am unable to agree with the majority in this case. While I have no quarrel with the discussion relating to the nature of the right to hunt on land of another, it seems to me that in the application of the rule in the opinion of the majority they have ignored both the nature of a banking corporation and the essential characteristics of the right here involved as applied to such corporation. At the outset, it must be clear that the right to hunt and take wild animals has many attributes which distinguish it from the right to take coal, wood, oil, or other minerals from the land of another. While all these rights are designated in law as profits a prendre, they still have some vital differences which go to the very nature of the right itself. A profit a prendre, as recognized in the majority opinion, is a right exercised by one man in the soil of another, *accompanied with participation in the profits of the land, or a right to take a part of the soil or produce of the land.* It must follow that, if there is no right to participate in the profits of the soil or a right to take a part of the soil or produce of the land, there can be no profit a prendre.

The majority state that a corporation acts through its officers or its agents—and that is true in most cases—but it is not, and cannot be, true in this state when dealing with the right to hunt.

I think it needs no citation of authorities to establish that under our laws no one may hunt without a license. The license to hunt is personal to the licensee. No one, corporate or otherwise, may exercise the right through a license granted to an agent. Nor may a corporation receive the benefits of game taken by its officers or agents in any other way. Wild game may not be sold. It may not be possessed beyond the limits provided by law. There is, therefore, no conceivable way in which a banking corporation may participate in the profits or produce of the land under this kind of right, and I think it must

follow therefrom that banking corporations cannot own such a profit a prendre. Where a profit a prendre involves the right to remove wood or coal or to mine minerals, there is no legal obstacle to prevent a corporation from enjoying the benefits of the right so conferred. It is not necessary that the corporation actually exercise its right to participate in the profits of the soil, but it is enough that it has the legal capacity to exercise its right if it chooses to do so. The distinction between that kind of a profit a prendre and the kind we have here is that here the corporation never will have the legal capacity to exercise its claimed right.

In dealing with a right so onerous as this, I think that the right should be strictly construed and should not be extended beyond the limits of the grant. It should also be possible to determine the limits of the grant from the instrument creating it, or at least it should be possible to determine by fair implication therefrom what its limits are. In Restatement, Property, § 450, *comment m,* we find the following statement of this rule:

"Some degree of definiteness in the scope or extent of an interest is essential to its recognition as a property interest. * * * In order that privileges of use may be recognized as easements[2] there must be some degree of definiteness in the privileged use. When a use has not the degree of definiteness necessary to the creation of an easement, the privilege to make it can be nothing more than a license."

It has been uniformly held by the authorities which have passed on the question that the right to hunt on the premises of another should be strictly construed and may not be extended beyond the grant.[3] The owner may not permit others to use it.[4]

[2]Restatement treats both ordinary easements and profits a prendre as easements.

[3]Bingham v. Salene, 15 Ore. 208, 14 P. 523, 3 A. S. R. 152; Isherwood v. Salene, 61 Ore. 572, 123 P. 49, 40 L.R.A.(N.S.) 299, Ann. Cas. 1914B, 542; 24 Am. Jur., Game and Game Laws, § 7.

[4]Bingham v. Salene, 15 Ore. 208, 14 P. 523, 3 A. S. R. 152; Salene v. Isherwood, 55 Ore. 263, 106 P. 18; Isherwood v. Salene, 61 Ore. 572, 123 P. 49, 40 L.R.A.(N.S.) 299, Ann. Cas. 1914B, 542; Boyd v. Colgan, 126 Kan. 497, 268 P. 794; Anderson v. Gipson (Tex. Civ. App.) 144 S. W. (2d) 948;

In Bingham v. Salene, 15 Ore. 208, 215, 14 P. 523, 526, 3 A. S. R. 152, frequently cited, the court said:

"* * * While 'the supposed odiousness of this right,' as Lord Campbell said,[5] 'cannot influence our decision,' the fact, at least, admonishes us that no intendments or presumption are to be indulged in in the construction of the grant not warranted by the plain import of its terms and provisions. A grant of this description is construed strictly."

If the corporation may not hunt through its officers or agents; may not receive or possess that taken by its agents; may not receive the proceeds from a sale thereof; or may not permit others to use the right to hunt, what right did it have? The majority seem to proceed on the theory that it still had an interest in the land which it could sell or assign. But I think it is axiomatic that it could not sell or assign more than it had. Nor could it, by assignment, enlarge or create a right which it did not have. If it had nothing, it could assign nothing.

There is a clear distinction between this case and cases such as Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222, and St. Helen Shooting Club v. Mogle, 234 Mich. 60, 207 N. W. 915. In those cases the corporation was organized for the express purpose of providing hunting for its members. The ownership of the right to hunt has been upheld, but there, the corporation holds the right for the use of others. It stands largely in the position of a trustee. The members are the actual owners of the right and may take the game not for the use of the corporation but for their own use. If we are to follow the doctrine that the right to hunt is a profit a prendre, it must follow that those who have a right to participate in the profits are the actual owners of the right itself. This fact is recognized in the Minnesota Valley Gun Club case where we said (207 Minn. 130, 290 N. W. 225):

Council v. Sanderlin, 183 N. C. 253, 111 S. E. 365, 32 A. L. R. 1527; 24 Am. Jur., Game and Game Laws, § 7; 38 C. J. S., Game, § 4.

[5]See, Ewart v. Graham, 7 H. L. Cas. 331.

"With respect to the question of the ability of the members of plaintiff corporation to exercise the right given by the assignment, we think, under the facts, that many provisions establish that the contracting parties intended that the beneficial enjoyment should be exercised by the group actually composing the club. Flory's close association with it was known to Yardeen. Imperfect draftsmanship stifled accurate expression, but there are sufficient factors to establish the intent of the parties. Under the assignment the members can enjoy the profit."

There can be no claim here that the reservation by the bank created a right for the benefit of others. The claim apparently is that the officers of the bank may exercise the right for the bank.

In cases such as Minnesota Valley Gun Club v. Northline Corp. *supra*, it is also possible to determine, at least by implication, some limits to the use of the right. It is limited to use by its members. Here, the majority fail to point to any limit. They simply say that the corporation acts through its officers and agents, but in so acting they act for the ultimate benefit of stockholders. How the stockholders can get any benefit out of the exercise by the officers of the right to shoot a wild duck is something I am unable to see. Certainly the officers who shoot the duck have no more right to appropriate it to their own use than they have to the bank's money or any of its other property without accounting to the stockholders therefor.

Apparently the trial court had little confidence in its finding that the bank acquired a valid right by its reservation which was assigned to Dahl, for it sought to bolster its decision by holding that Dahl acquired the right in several other inconsistent ways also. The majority apparently evade this issue by holding that it is unnecessary to pass on it. I think that it should be disposed of. In the first place, the bank either did or did not acquire exclusive rights to hunt by its reservation. These rights have been acquired by Dahl, whatever they were, by the assignments. If the reservation was valid, neither plaintiff nor the Federal Land Bank had any further right to convey, and Dahl then needs no help from any other source. If, and only if, the reservation created no right, the question arises

whether Dahl has acquired the rights he claims to have from some other source.

The trial court held that Dahl acquired the right to hunt by payment, or credit upon the contract from Federal Land Bank, to plaintiff of the sum of $1,000. This holding is untenable for several reasons. In the first place, it is completely contrary to all the evidence in the case. The evidence shows, without dispute, that when the Federal Land Bank discovered that Dahl claimed to have a right to hunt on this land it did everything it could to get him to release whatever rights he had. Failing in this, it paid plaintiff $1,000 in order that it might be relieved of liability *to plaintiff* for not being able to deliver clear title. In consideration for the amount he received, plaintiff accepted responsibility for clearing the title or accepting it as it was if it should be determined that Dahl had acquired the exclusive right to hunt under the original reservation to the bank. There is not one word of evidence to sustain a finding that anyone intended to grant or create a right in Dahl, by virtue of this payment, that he did not already have. Dahl parted with no consideration for any grant by plaintiff or the Federal Land Bank, and certainly they cannot be said to have done anything at this point which would cause Dahl to believe that he was being granted anything by them. Their entire dealings were hostile to each other. There never was any meeting of the minds that the Federal Land Bank or plaintiff should convey to Dahl any interest by virtue of this payment. How we can hold that the parties intended by this payment to create an interest in the land in favor of Dahl and at the same time hold that Dahl acquired the same right by virtue of his assignment from the bank is something I am unable to follow. Dahl, during all this time, claimed that he already owned the right to hunt and at that time asked for no help from either plaintiff or the Federal Land Bank. Surely, it cannot be held that by accepting a deed subject to easements of record plaintiff validated easements which were in fact invalid for the benefit of a third party not in privity with the contracting parties. It is not uncommon in the field of conveyancing for a grantor to relieve himself of liability to his

grantee by providing that the grantee takes subject to such easements as appear of record. If an invalid easement happens to cloud the title, such language can hardly have the effect of curing a defect existing in such easement or of transforming a bad easement into a good one. The best that can be said here is that plaintiff accepted the title subject to such legal rights as Dahl had. If he had none, the exception created none. If he had a legal right, plaintiff relieved his grantor of liability on account thereof. The same is true of the subsequent mortgages. Even if it could be said that plaintiff mistakenly believed that Dahl had a valid right, such belief would not create a right in Dahl which he did not already own.

There is another and probably more cogent reason why this finding is untenable. Profits a prendre from the earliest times have been considered to be interests in land that are within the statute of frauds.[6] A profit a prendre can be created only by a properly executed writing[7] or by prescription.[8] It cannot be created by a parol agreement.[9] Where, then, is there any instrument in writing creating or intending to create any rights in Dahl by virtue of the payment of $1,000 by the Federal Land Bank to plaintiff? If there is no writing, what evidence is there that the case is taken out of the statute of frauds?

The trial court, in addition to holding that Dahl acquired rights by virtue of the reservation to the banking corporation and, if not, that he acquired rights by virtue of the payment of $1,000 by the Federal Land Bank to plaintiff, then apparently went on to hold that, if neither of these two would stand up, he had still acquired a right by prescription by exercising the right for a period of 18 years without objection by plaintiff. This, too, is not supported by the

[6]28 C. J. S., Easements, § 3f; Webber v. Lee [1881] 9 Q. B. D. 315, 51 L. J. Q. B. 485; Annotation, Ann. Cas. 1914B, 545; Bingham v. Salene, 15 Ore. 208, 14 P. 523, 3 A. S. R. 152.

[7]Minnesota Valley Gun Club v. Northline Corp. 207 Minn. 126, 290 N. W. 222.

[8]28 C. J. S., Easements, § 3f.

[9]Taylor v. Millard, 118 N. Y. 244, 23 N. E. 376, 6 L. R. A. 667; Council v. Sanderlin, 183 N. C. 253, 111 S. E. 365, 32 A. L. R. 1527.

516

evidence and is untenable. The trial court apparently also held that plaintiff was barred by laches. The doctrine of laches ordinarily has no application where the rights of the parties are governed by a statute of limitations.[10] We apprehend that the trial court's finding, insofar as it relates to the statute of limitations, in essence amounts to a finding that defendant has acquired a right to hunt by prescription.

There is some question whether a profit a prendre in gross can be acquired by prescription. It is doubtful whether it could be so acquired under the law in England. See, Bailey v. Stephens, 12 C. B. N. S. 91. However, I will assume for the purpose of this decision that such interest could be acquired by prescription.

The term "prescription" is used to denote acquisition of an incorporeal hereditament and is comparable to the term "adverse possession" with respect to the acquisition of title to land. While the statute of limitations probably does not apply to the acquisition of an interest in land by prescription, by analogy it is applicable insofar as the time required for the acquisition of such right is concerned. The same rules apply to the acquisition of a prescriptive right as to the acquisition of title by adverse possession, with such differences as naturally are inherent in the application of the rules to the type of interest involved.[11] The same rules also apply to the acquisition of a profit a prendre by prescription as to the acquisition of an easement.

Before a prescriptive right can be acquired, there must be a claim of right coupled with a use.

"* * * A mere claim of right, unaccompanied by any acts showing an exercise of the right, or at least an intention to exercise it in the future, is insufficient to show user or intended user." Simons v. Munch, 115 Minn. 360, 372, 132 N. W. 321, 326.

Where a claimant needs the use of an easement, or can make use of it, only at periodic times, the use of the claimed right during such times as is possible to use it, even though not constant, is sufficient

[10]Vadnais v. State, 224 Minn. 439, 28 N. W. (2d) 694; Aronovitch v. Levy, 238 Minn. 237, 56 N. W. (2d) 570.

[11]Romans v. Nadler, 217 Minn. 174, 14 N. W. (2d) 482.

to be adverse. Swan v. Munch, 65 Minn. 500, 67 N. W. 1022, 35 L. R. A. 743. The rule is stated in Restatement, Property, § 459, *comment b,* as follows:

"To satisfy the requirement that the use be continuous it is not necessary that it be constant. A use may be continuous though there are periods of time more or less extended between the specific acts of use. Many easements, such as rights of way and rights of hunting or fishing, which are periodical or only occasional in use may be acquired by prescription. The requirement means that there be no break in the essential attitude of mind required for adverse use rather than that the use be constant."

The use must be continuous however, as qualified by the above statements, and uninterrupted. The owner of the servient estate must have knowledge of it and acquiesce in its use. 28 C. J. S., Easements, § 12, reads as follows:

"* * * in order for a user to ripen into a prescriptive right it must not only be under a claim of right, as stated * * * but *must* also *be with the knowledge and acquiescence of the owner of the servient tenement,* as such acquiescence is the foundation of the right by prescription, and anything which disproves acquiescence rebuts the presumption of a grant." (Italics supplied.)

The rule is stated in Merrick v. Schleuder, 179 Minn. 228, 230, 228 N. W. 755, 756, as follows:

"* * * Without any excursion into the wilderness of authority on the subject, it is sufficient to refer to the rule, well established in this state in accord with the weight of authority elsewhere, that 'where the claimant has shown an open, visible, continuous and *unmolested* use' for the required period inconsistent with the owner's right and *under circumstances from which may be inferred his knowledge and acquiescence,* the use will be presumed to be under claim of right and adverse so as to place upon the owner the burden of rebutting this presumption by showing that the use was permissive." (Italics supplied.)

A prescriptive right may not be acquired where the owner of the servient estate denies the right to use it.[12] The rule is stated in 28 C. J. S., Easements, § 13, as follows:

"* * * An easement cannot arise by prescription if the owner of the servient estate has habitually broken and interrupted the use at will or denied the right and threatened to put an end to the use and enjoyment of it, for it cannot be said that the owner has acquiesced in a right which has been exercised against his protest."

Substantially the same rule is stated in 17 Am. Jur., Easements, § 60, as follows:

"One of the essentials to an easement of prescription is that the use and enjoyment must be continuous and uninterrupted. If the use of a way is interrupted, prescription is annihilated and must begin again, and *any unambiguous act by the owner, such as* closing the way at night or *erecting gates* or bars, which evinces his intention to exclude the public from its uninterrupted use destroys the prescriptive right. The correct rule as to continuity of user and what shall constitute such continuity can be stated only with reference to the nature and character of the right claimed. A failure to use an easement when not needed does not disprove a continuity of use shown by using it when needed. The uninterrupted and continuous enjoyment of a right of way necessary to constitute adverse possession does not require the use thereof every day for the statutory period, but simply the exercise of the right more or less frequently according to the nature of the use. It must be without objection on the part of the owner of the land and under such cir-

[12]Stacey v. Miller, 14 Mo. 478, 55 Am. D. 112; Chicago & N. W. Ry. Co. v. Hoag, 90 Ill. 339; see, Wooldridge v. Coughlin, 46 W. Va. 345, 33 S. E. 233; Washburn, Easements and Servitudes (4 ed.) c. 1, § 4, p. 180; 1 Thompson, Real Property (Perm. ed.) § 418; 4 Tiffany, Real Property (3 ed.) § 1200; 2 American Law of Property, § 8.58; Dartnell v. Bidwell, 115 Me. 227, 98 A. 743, 5 A. L. R. 1320; Powell v. Bagg, 74 Mass. (8 Gray) 441, 69 Am. D. 262.

cumstances as to exclude the presumption of voluntary abandonment on the part of the person claiming the easement." (Italics supplied.)

To prevent a right by prescription from being acquired it is not necessary for the owner of the land to commence an action in court, but it is enough if he does some act to manifest his objections to the use. Chicago & N. W. Ry. Co. v. Hoag, 90 Ill. 339.

In Brayden v. New York, N. H. & H. R. Co. 172 Mass. 225, 51 N. E. 1081, the court said:

"* * * A landowner in order to prevent that result [acquiring a right by prescription] is not required to battle successfully for his rights; it is enough if he asserts them to the other party by an overt act, which, if the easement existed, would be a cause of action. Such an assertion interrupts the would be dominant owner's impression of acquiescence and the growth in his mind of a fixed association of ideas, or, if the principle of prescription be attributed solely to the acquiescence of the servient owner, it shows that the acquiescence was not a fact."

There is some conflict in the authorities as to whether a mere oral protest is sufficient or if some overt act is necessary to negate acquiescence.[13]

A void grant of a claimed right is admissible to show the extent of the right claimed. Washburn v. Cutter, 17 Minn. 335 (361); Murphy v. Doyle, 37 Minn. 113, 33 N. W. 220.

Tested by these rules, what have we in this case? The quitclaim deed from the Fergus Falls National Bank and Trust Company to Bergerud, recorded in December 1933, shows that the bank claimed the right to hunt on the premises. The assignment by the bank to Ulland and Dahl was not recorded until August 12, 1942, and the assignment by the heirs of Ulland to Dahl, until April 14, 1951. As far as appears from the record, no one other than the assignees had actual knowledge of such assignments, at least until the date of recording. The record fails to show any attempt to assert the right

---

[13]Lehigh Valley R. Co. v. McFarlan, 43 N. J. Law 605; Dartnell v. Bidwell, 115 Me. 227, 98 A. 743, 5 A. L. R. 1320; Annotation, 5 A. L. R. 1325; 1 Thompson, Real Property (Perm. ed.) § 443.

520

to hunt on the premises until 1939. At that time plaintiff had placed a lock on the gate through which defendant must enter the premises. Defendant sawed the lock off, claiming a right to enter. Surely up to that time there was no evidence of acquiescence by the landowner. It does appear that after the farm was sold to plaintiff the Federal Land Bank wrote Ulland in 1938 seeking to procure a release, which was refused, so it is reasonable to assume that from 1938 plaintiff's predecessor in interest knew that the Fergus Falls National Bank and Trust Company claimed the right to hunt as set forth in its reservation. The reservation to the bank being void, the bank could not acquire a prescriptive right, since it could not make use of such right. There is evidence that from 1939 on plaintiff recognized and acquiesced in defendant's right to hunt under the mistaken belief that he had such right by virtue of the deed to the bank. We are therefore confronted with a situation where the only evidence of an initial attempt to assert any right by defendant occurred in 1939. At that time plaintiff did what he could to keep defendant off. This action was brought in 1951. The statute had not run at that time. Under these circumstances, the evidence falls short of that required to establish a prescriptive right.

I think that the rule should be that a right to hunt on the premises of another may not be granted to or reserved by a corporation except in those cases where the right is granted to the corporation for the use and benefit of individuals who can make use of it and where the limits of the use may be fairly determined from the instrument creating the right or by fair implication therefrom. It is my opinion that the evidence in this case fails to establish a valid profit a prendre, either by the reservation contained in the original deed to the Fergus Falls bank or by prescription or otherwise, and that the decision of the trial court should be reversed.

MATSON, JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Knutson.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.