We cannot hold as an inference of law that the defendant waived his alleged defense by the execution of the note; for, according to his contention, the loss he claims subsequently to have suffered could not then be ascertained or estimated.

The judgment of his Honor in dismissing the defendant's counterclaim is reversed, and this will be certified to the end that the court may determine the matters in controversy in accordance with law.

Reversed.

---

J. P. COUNCIL ET AL. v. W. T. SANDERLIN ET AL.

(Filed 5 April, 1922.)

**1. Game—Hunting—Statutes.**

The legislative power to enact game laws upon the principle that game does not become private property until reduced to possession, is binding upon the owners of land and all others, and, subject thereto, such owners have the right to protect the game upon their own lands against trespassers thereon.

**2. Same—Deeds and Conveyances—Reservation of Privilege—Profit a Prendre—Venary.**

By deed, or other proper written conveyance, but not by parol, the owner of lands may convey the hunting privileges thereon under such terms as may be agreed upon, separate from the lands, under the principles applying to a _profit a prendre,_ classified by Blackstone under the heading of "Venary," it being an estate in the lands to that extent, and not subject to revocation at the will of the owner.

**3. Same—Rights and Remedies.**

The remedy of one whose hunting rights over the lands of another are being violated is, in proper instances, by suit for specific performance, by injunction, or by an action for damages.

**4. Game—Definition.**

The ownership of the right to shoot for sport over the lands of another is not limited to game in a strict sense, but confers the right to shoot such animals as are ordinarily understood to be a subject of such sport.

**5. Game—Reservation of Privilege—Deeds and Conveyances—Estates.**

The privilege of hunting over the lands of another is such an estate therein as may be assigned by or inherited from the owner, when the grant does not otherwise determine the rights of the parties.

**6. Same—Perpetuities.**

The right of one to hunt upon the lands of another is a present and not a future interest, to which the rule against perpetuities is inapplicable.

**7. Game—Deeds and Conveyances—Reservation of Privileges—Evidence—Letters.**

Where the wording of a grant of the right to hunt upon the lands of another is ambiguous, a letter written before the controversy arose, by a grantee of the lands, may be introduced as evidence of weight against the claimant of the right from a later owner of the land to hunt.

**8. Game—Deeds and Conveyances—Reservation of Privilege—Leases—Rights of Grantee of Land.**

The owner of land conveyed it, reserving for himself, his heirs and assigns, the right to hunt over such portions as may remain uncleared and uncultivated, and to protect the game thereon against trespass of all persons except the grantee, his "executors, administrators and· assigns": *Held,* the hunting rights of the grantor over the portion designated did not exclude the right of the grantee and his successors while they owned the lands to hunt thereon themselves, but a lease made by the latter of the hunting privileges was invalid as an invasion of the right which the grantee had reserved.

[Citation by CLARK, C. J., of status of game in North Carolina two centuries ago.]

APPEAL by defendants from *Connor, J.,* at January Term, 1922, of BLADEN.

The plaintiffs conveyed to the Southern Chemical Company, 10 July, 1902, a tract of 1,319 acres on Lake Waccamaw, in Bladen County, in fee simple, with the following reservation: "But the said J. P. Council and J. A. Council reserve for themselves, their heirs and assigns, the right to hunt on any of the above described lands as may remain uncleared and uncultivated, and the power to protect the game on said land against the trespass of all persons except the Southern Chemical Company, their executors, administrators, and assigns."

It is found as a fact by the court that the plaintiffs have never abandoned their rights under the reservation, or exception, above mentioned, but have continuously exercised said rights since the execution of said deed, and that the lands in question are chiefly what is known as savannah lands, and, under present conditions, of little value for anything other than hunting purposes.

On 22 December, 1902, the Southern Chemical Company conveyed to the Southern Products Company the above tract of land with the above clause that the conveyance is subject to the existing rights of J. P. Council and J. A. Council to hunt over the above described lands that may remain uncleared and uncultivated, and with the power to protect game in said land against trespass, as particularly specified in the above deed from Council & Council to said chemical company. On 1 January, 1903, J. A. Pickett, acting under power of attorney from the Southern Products Company, conveyed the said land to the Worth Company by a mortgage to secure a loan. The lands were sold under mortgage to Matt J. Heyer on 3 May, 1905, and soon thereafter said Matt J. Heyer conveyed the land to J. A. Pickett (the present owner thereof), and on 11 November, 1921, Pickett and wife conveyed to the defendant W. T. Sanderlin and H. M. McAllister, by way of lease for five years, the "right of hunting and protecting the game and all wild life on said lands and the right to exclude all persons from entering upon said lands with firearms or dogs or other devices used in the capture of wild life."

The above deeds were all duly probated and recorded. This is a proceeding or restraining order, which was made permanent, to prohibit Sanderlin and McAllister from interfering with the plaintiff's hunting rights on said land. Said defendants allege that the reservation, in the Council deed above, of the hunting privilege is void, and that the plaintiffs are trespassing on the rights of Sanderlin and others, and sought a restraining order against plaintiffs from hunting or trespassing upon said lands. The causes were consolidated, and upon the facts found the restraining order against Council and others was dissolved, and it was made permanent against the defendants, who appealed.

*Sinclair, Dye & Clark and R. S. White for appellees.*
*E. F. McCulloch, Lyon & Johnson, and Johnson & Johnson for appellants.*

CLARK, C. J. The plaintiffs conveyed the land in fee simple in 1902, reserving the hunting privileges thereon, and the court finds, in this proceeding, as a fact that the plaintiffs have never abandoned their rights under said reservation, but have continuously exercised same since the execution of the deed of 10 July, 1902, and the court held as a matter

of law that the plaintiffs "have the exclusive right to enter upon the uncleared and uncultivated portions of the lands in question, in person, and with invited guests, and have the power to protect the game thereon, except such injury thereto as may be caused by the owner in the use of said land for purposes other than hunting," and made permanent the restraining order in behalf of said Council and others.

The sole point presented, therefore, is as to the validity and construction of such reservation in a conveyance of the realty. In *S. v. Gallop,* 126 N. C., 979, this Court fully discussed the right of hunting, and held that the ownership of game is in the people of the State, and the right to hunt and kill game may be granted, withheld, or restricted by the Legislature, and that game does not become private property until reduced to possession. But it further held that landowners can prevent others from hunting on their land in virtue of their right to keep trespassers off the land or under statutory enactment. *S. v. Gallop, supra,* has been often cited and approved. See citations thereto in 2 Anno. Ed. It is under the authority of this principle that our laws for the preservation of game have been enacted. Under the game laws applicable to that county there are only two months in the year during which game can be hunted. The legislative restriction is valid against the owners of the hunting privilege, and the rest of the world besides. The question here presented is whether the owner of real estate, in conveying the same, can dissever from the title to the land and retain in himself and his heirs and assigns, either solely or jointly with the grantee in the deed, the hunting privilege. The law is summed up with much fullness in the able and interesting brief filed by the plaintiffs' counsel.

Beginning with the earliest English cases, it has been held uniformly that a shooting privilege is a *profit a prendre,* and in *Davies' case,* 3 Mod., 246, it was held that one might acquire a prescriptive right over the lands of another. A right to shoot and take game is a *profit a prendre,* and was held to be an interest in land within the statute of frauds. *Webber v. Lee,* 51 L. J. Q. B., 485. It has also been held in numerous cases in England that the right granted by deed to kill and take game was an incorporeal hereditament, which Blackstone styles the right of venary. 2 Bl. Com., 415. In *Payne v. Sheets,* 75 Vt., 355, it was held that the exclusive right to shoot and fish upon the lands of another when not granted in favor of any dominant tenement, is not an easement, but a *profit a prendre,* and the grantee of such right, though not the owner of the soil, has such interest in land as would entitle him to maintain an action of trespass, under a statute authorizing such an action, in respect of lands by the owner thereof.

In *Shooting Club v. Barber,* 150 Mich., 571, it was held that a right to shoot over the lands of another, acquired in connection with the purchase

of a lot carved therefrom, is not a mere revocable license, but an interest which will support an action for specific performance.

There are also numerous cases not necessary to cite that a clause in a lease of land reserving to the lessor the right of "shooting and sport" over land is not limited to game in a strict sense, but confers the right to shoot such animals as are ordinarily understood to be a subject of such sport.

In *Wickham v. Hawker,* 7 Mees. & W., 63, it is held that a grant to one and his heirs and assigns of the liberty to hunt on the grantor's land was a grant and not a mere revocable license. A deed for shooting privileges on land is a grant of a *profit a prendre. Isherwood v. Salene* (Or.), 40 L. R. A. (N. S.), 299, citing numerous cases.

In 12 R. C. L., 689, 690, the law is thus summed up: *"Acquisition of hunting rights in premises of another.* Though one person has no natural right to hunt on the premises of another it is clear that a right to do so may be acquired by a grant from the owner. Or the owner can convey his premises and reserve to himself the hunting and fowling rights thereon. An owner of lands may convey exclusive hunting rights thereon to others so as to bar himself from hunting on his own premises. He may make a lease of the hunting privileges giving the lessees the exclusive right to kill game or water fowl on the premises, and at the same time reserve to himself the pasturage rights on the premises. The right to hunt on another's premises is not a mere license, but is an interest in the real estate in the nature of an incorporeal hereditament, and as such it is within the statute of frauds and requires a writing for its creation. Nor is the right of one person to hunt or fowl on premises owned and in the possession of another an easement, for strictly speaking, an easement implies that the owner thereof shall take no profit from the soil. The right is more properly termed a *profit a prendre.* Unless the grant otherwise determines the rights of the parties, the owner of the hunting privileges may assign his rights to another, but he cannot give a pass or permit to another so as to allow the latter to exercise hunting privileges on the premises." To same purport, 9 R. C. L., 744.

*Profit a prendre* is created by grant; it cannot be created by parol. If enjoyed by reason of holding certain other estate it is regarded in the light of an easement appurtenant to an estate; whereas, if it belongs to an individual (as in this case), distinct from any ownership of other lands, it takes the character of an estate in the land itself, rather than that of an easement therein. Furthermore, such right may be assignable or inheritable, which is not the case with an easement in gross. Examples of *profit a prendre* are the right to take timber from the land of another,

or coal, or to fish in water belonging to another, 9 R. C. L., 744, or to shoot over land or to take game or wild fowl, 14 Cyc., 1143, note 29.

The right of hunting or fowling on another's lands or water may be acquired by grant or lease from the owner, either with or without the soil, and with such restrictions or limitations as the owner may see fit to impose. This right, being a right of profit in the land, passes by grant or lease of the land, unless expressly reserved. *Lee v. Mallard,* 116 Ga., 18; *Beckman v. Kreamer,* 43 Ill., 447; *Matthews v. Treat,* 75 Me., 594.

In *Ingram v. Threadgill,* 14 N. C., 61, it is said: "The Pee Dee River, at the place where the trespass is alleged to have been committed, is not a navigable river, but a private one, and the owners of the land on each side of it have a right to the middle of it. The same may be said of rivers which divide nations. *Handley v. Anthony,* 5 Wheat., 374. Although these franchises of fisheries are not granted by the State as lands are by law granted, yet when the lands adjoining such rivers are granted, the right of fishing vests in such grantees, and gives them the right of fishing to the middle of the stream in the water opposite their land, but not the right of fishing in water above or below the banks which belong to them."

This case is cited in *S. v. Glen,* 52 N. C., 326, where it is said: "As the riparian proprietor of the land on both sides of the stream, he is clearly entitled to the soil entirely across the river, subject to an easement in the public for the purpose of transportation of lime, flour, and other articles in flats and canoes. He is also, as such proprietor, entitled to the exclusive right of fishing entirely across the stream." This was said as to the Yadkin River, where it was nonnavigable.

The rule against perpetuities has no application to such interests over the lands of others because they are present and not future interests. Gray, Perpetuities, sec. 279.

Not only is an injunction, as well as an action for damages, a proper remedy for the protection of an exclusive hunting privilege, but if a member of the public is denied his common right to hunt on public waters, the interference with this right may be enjoined. 9 R. C. L., 691, and cases there cited.

In this record there is in evidence a letter from J. A. Pickett, one of the *mesne* grantees of the premises and lessor of defendants, written in 1903, to the plaintiff in which he stated: "I have given no one the right to hunt on your preserves, nor have I myself fired a gun on the property and would not have gone on the premises or gone with any of my neighbors to hunt thereon without your (plaintiff's) permission except as to the little plots of peas and buckwheat"; as Council's reservation of the shooting privilege did not include the cleared or cultivated

portions and that he had "always recognized Council's right." This, however, has no legal effect, except as a recognition of the meaning and intent of the reservation, if the same had been ambiguous, upon the familiar principle that when a contract is ambiguous in its terms, a construction given to it by the parties thereto, and by their actions in regard thereto, before any controversy has arisen as to its meaning, made with knowledge of its terms, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court.

The words of the conveyance to be construed are as follows (after granting the premises in fee to the Southern Chemical Company): "But the said J. P. Council and J. A. Council reserve for themselves, their heirs and assigns, the right to hunt on any of the above described lands as may remain uncleared and uncultivated, and the power to protect the game on said land against the trespass of all persons except the Southern Chemical Company, their executors, administrators, and assigns."

We understand the meaning of this conveyance to be a reservation of the right of hunting, the *profits a prendre* to the grantors in fee simple as to such part of the premises as remain "uncleared and uncultivated," and so long as they so remain, with power given the grantors to protect the game thereon against being hunted by any persons except the Southern Chemical Company, their executors, administrators, and assigns.

The decree entered by the court in this case provides that the plaintiffs "have the exclusive right to enter upon the uncleared and uncultivated portions of the lands in question, in person and with invited guests, and have the power to protect the game thereon, except such injury thereto as may be caused by the owner in the use of said land for purposes other than hunting." We think that the above decree is a proper construction of the reservation, except in the use of the word "exclusive," and that a proper construction of the deed, including the reservation, is that the grantees also had the right to hunt upon the premises, and so have their successors, as owners of the land; that is, that the grantors have a fee-simple right of hunting, and that their grantees have the same right so long as they are owners of the premises. As such, they have a base and qualified right in the hunting privilege, but without the right to extend such privilege to others. The grantees of the land and their assigns of the lands have the right to hunt on the premises themselves, while owners thereof, jointly with the fee-simple privilege of hunting reserved by the reservation to the grantors. The use of the words giving the grantors the right to protect the game on said land against trespass of "all persons except the Southern Chemical Company, their executors, administrators and assigns," must necessarily be limited to the grantees of the land and the assignees of the ownership thereof.

If not so limited, it would clearly be destructive of the reservation to the grantors of protection of the game. This is evidenced by the attempted lease for five years by the present owners of the land to the defendants, Sanderlin and McAllister, of the "right of hunting and protecting the game and all wild life on said lands, and the right to exclude all persons from entering upon said lands with firearms or dogs, or other devices used in the capture of wild life." This attempted lease is invalid, for it is not connected with the ownership of the land, and under it the grantees attempted even to exclude the plaintiffs, who unquestionably have the hunting privilege in fee simple.

The court properly granted an absolute injunction against the defendants Sanderlin and McAllister, and sustained the validity of the claim of the plaintiffs as against them. We think, however, that the owners of the land have the right to hunt over the same themselves, but without power of leasing said privilege or granting it to others, 12 R. C. L., 890; *Bingham v. Salene,* 15 Or., 208; 3 A. S. R., 152. The word "exclusive," therefore, should be stricken out of the decree, which, as thus modified, will be affirmed.

We have quoted largely in this opinion from the learned and well considered brief of the plaintiff, and as a matter of more than usual interest to the public and the profession, we insert here from that brief the following incident which occurred very near to, if not upon these very premises, on the banks of Lake Waccamaw, 188 years ago, as follows:

"On 18 July, 1734, a traveler, lured by the glowing descriptions that he had heard of Waccamaw Lake, set out from a point on the Cape Fear River to visit that spot. In making the journey he passed quite near to, if not through, the hunting preserve of the plaintiff. This soldier of fortune, writing of the trip, says in part: 'We came to a large cane swamp, about half a mile through, which we crossed in about an hour's time, but I was astonished to see the innumerable sights of mosquitoes, and the largest that I ever saw in my life, for they made nothing to fetch blood of us through our buckskin gloves, coats, and jackets. As soon as we got through that swamp we came to another open pine barren, where we saw a great herd of deer, the largest and fattest I ever saw in those parts; we made shift to kill a brace of them, which we made a hearty dinner on. We rode about two miles farther, when we came to another cane swamp, where we shot a large she-bear and two cubs. The swamp was so large that it was with great difficulty we got through it. When we got to the other side, it began to rain very hard, or otherwise, as far as I know, we might have shot ten brace of deer, for they were almost as thick as in the parks in England, and did not seem to be in the least afraid of us, for I question much whether

they had ever seen a man in their lives before, for they seemed to look on us as amazed. We made shift as well as we could to reach the lake the same night, but had but little pleasure; it continued to rain very hard, we made a large fire of lightwood, and slept as well as we could that night. The next morning we took a particular view of it, and I think it is the pleasantest place that I ever saw in my life. It is at least eighteen miles around, surrounded with exceedingly good land, as oak of all sorts, hickory, and fine cypress swamps. There is an old Indian field to be seen, which shows it was formerly inhabited by them, but I believe, not within these fifty years, for there is scarce one of the Cape Fear Indians, or the Waccamaws, that can give any account of it. There is plenty of deer, wild turkey, geese, and ducks, and fish in abundance; we shot sufficient for forty men though there were but six of us.' " Sprunt's "Chronicles of the Cape Fear," 46 (2 ed.).

To which the brief appropriately adds: "All must agree that these worthy gentlemen, near two hundred years ago, upon the very game preserve, the right to a part of which is involved in this appeal, set a bad example by shooting enough game for forty men when only six could benefit thereby. Sad to record, this bad example has been so universally followed that the once magnificent American game, like its *quondam* denizens of the pristine forests, the American Indian, has become almost extinct. The look of amazement detected by the stranger in 1734, in the appealing eyes of the beautiful deer of the Waccamaw section as they looked, perhaps for the first time, upon man, has given place to a glint of horror and despair as the few survivors rush headlong for the haven of rest maintained by the plaintiff. They have learned to know that there they may rest in peace save for two months in each year, and that even during this time they will occasion far more fright to the inexperienced hunters to whom they so suddenly appear than they need entertain for themselves.

"The plaintiff, big of body, of mind, and of heart, living by the side of the beautiful Waccamaw, is no more a lover of the hunt than of the hunted. Nature speaks strongly to him, and he is a lover of all wild life. Always has he labored for the enactment and enforcement of wise and beneficent laws intended to prevent the complete extermination of the game which once so richly abounded in his section. Doubtless there is more game on the preserve maintained by him, and for miles around it, than in any other part of the State; yet, had it not been for his persistent efforts, the hide and horns of a deer would be today an object of great curiosity in all that section. So that not only by the law of the case is his position sustained, but by a wise policy as well."

Modified and affirmed.