**MATERA INVESTORS, INC., Plaintiff,**

v.

**SUNSET LAKE FISHING AND HUNTING CLUB, Defendant.**

**Civ. A. No. 87–74–VAL (WDO).**

United States District Court,
M.D. Georgia,
Valdosta Division.

Sept. 20, 1988.

Daniel S. Reinhardt, Joan B. Cravey, Atlanta, Ga., William P. Langdale, Valdosta, Ga., for plaintiff.

C. George Newbern, Valdosta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

Plaintiff Matera Investors, Inc., and defendant Sunset Lake Fishing and Hunting Club, Inc., are before the court in a diversity action in which each party seeks from the other, by complaint and counterclaim, tort damages and declaratory judgment. Both parties filed independent motions for partial summary judgment concerning the declaratory judgment counts of the complaint and counterclaim. The declaratory judgments sought by both parties concern the construction of a warranty deed dated May 14, 1945, by and between the Sunset Lake Fishing and Hunting Club and P.R. Lilly (hereinafter "Lilly Deed"), along with the resulting rights, obligations, and property interests of the parties. Both parties contend that construction is a matter of law for the court to decide. The court may grant a motion for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Georgia law, construction of a contract is a question of law for the court to decide. O.C.G.A. § 13–2–1. "The interpretation of the language in a deed and in a contract is generally a question of law for the court unless it is so ambiguous that the ambiguity cannot be resolved by the ordinary rules of construction." *Hardman v. Dahlonega–Lumpkin County Chamber of Commerce,* 238 Ga. 551, 233 S.E.2d 753 (1977).

### Factual Background

The dispute in this case concerns the construction of a warranty deed dated May 14, 1945 (the "Lilly Deed") which is in the chain of title to a 1,500 acre tract of land located in Lowndes County, Georgia, presently owned by plaintiff Matera Investors, Inc. (hereinafter "Matera"). Prior to May 14, 1945, defendant Sunset Lake Fishing and Hunting Club, Inc. (hereinafter "Sunset") was the fee simple owner of a 2,584 acre tract of land located in Lowndes County, Georgia. In 1945, Sunset received an offer to purchase this tract of land. On May 15, 1945, Sunset executed a deed to the property (the "Lilly Deed") to P.R. Lilly, the President of Sunset, who in turn, upon the same date, executed a deed to the property to the purchasers, W.W. Carroll, J.D. Carroll, and W.D. Martin. Through mesne conveyances, title to a 1,500 acre portion of the property described in the Lilly Deed has vested in Matera. The Lilly Deed contains certain reservations, including hunting and fishing rights, the construction of which are the basis for this lawsuit. A copy of the Lilly Deed is attached as Appendix A so the entire deed may be read in context.

The following numbered paragraphs are undisputed facts that summarize the dispute leading to this lawsuit.

1.

Plaintiff Matera is the fee simple owner of the property by record warranty deeds

of title and conveyance, including the Lilly Deed.

2.

Matera is in actual possession of the property based upon warranty deed of title.

3.

Defendant Sunset has not limited access to the property to the twenty-eight named members of the club.

4.

Sunset has allowed children of members and their friends to enter the property at will.

5.

Sunset has permitted use of the property by members' families, dependents, and friends.

6.

Sunset has permitted use of the club-house premises by nonmembers for business and entertainment purposes, including office and college parties.

7.

In 1987, Matera applied to the Lowndes County Planning Commission for rezoning of the property for use and development as a mobile home subdivision.

8.

After application for rezoning, Sunset retained legal counsel who threatened to commence legal action against Matera if it obtained its desired rezoning.

9.

On March 4, 1987, Matera obtained its desired rezoning from agricultural use to single family residential.

10.

On November 24, 1987, Matera filed this action seeking a judicial declaration as to the parties' rights, title, and interests in said property.

11.

Sunset's reservation of hunting and fishing privileges is properly construed as a *profit a prendre,* which is the right to take part of the land or produce of the land of another.

## Discussion

This court must resolve five main issues in order to determine the respective rights, obligations, and property interests of the parties under the Lilly Deed. These issues, listed in the order of discussion by the court, are as follows:

1. Whether the Lilly Deed reserves for Sunset an interest in only the 3.03 acres of land adjoining Brown Pond (described in paragraph three of page three of the Lilly Deed) or an interest in the entire 1,500 acre tract described in paragraph thirty-three of Matera's complaint?

2. Whether the Lilly Deed limits the use of Sunset's interest to only its twenty-eight named members?

3. Whether the reservations and obligations set forth in the deed, incident to the reservation of hunting and fishing rights and exclusive use of the clubhouse parcel, constitute "covenants restricting lands to certain uses" which will cease to be enforceable in September, 1992, by operation of O.C.G.A. § 44–5–60(b)?

4. Whether Sunset's rights under the Lilly Deed preclude Matera's good faith development of its 1,500 acres?

5. What are the respective rights of Matera and Sunset concerning the use of the surface of the waters above the lake beds on the premises?

I. The court will first determine whether the interests reserved in favor of Sunset in the Lilly Deed are limited to the 3.03 acre tract adjoining Brown Pond (described on page three, paragraph three of Lilly Deed) or extend to the entire 1,500 acre tract described in paragraph thirty-three of Matera's complaint.

Matera contends that the Lilly Deed contains conflicting language concerning the extent of the rights reserved to Sunset and is ambiguous in that it is not clear what rights and obligations set forth in the deed refer to which of the two legal descriptions contained in the deed (the 3.03 acres or the 1,500 acres). Matera maintains that the deed must be construed narrowly against the grantor, Sunset, to limit Sunset's rights, if any, to only the 3.03 acre tract.

Under Georgia law, the construction of a contract is a question of law for the court to decide. O.C.G.A. § 13–2–1. A contract should be construed by the court where the language is undisputed, but the meaning of that language is in dispute. *Board of Regents v. A.B. & E., Inc.*, 187 Ga.App. 671, 357 S.E.2d 100 (1987). Upon its reading of the Lilly Deed, this court finds that the deed clearly and unambiguously reserves to Sunset the "exclusive hunting and fishing privileges" extending to the entire 1,500 acre tract as described on pages one and two of the deed. The court also finds that the deed clearly and unambiguously reserves to Sunset the "exclusive use" of the clubhouse at Brown Pond together with the 3.03 acres on which the clubhouse is located as described in paragraph three, page three of the deed.

The first paragraph on page three of the deed "reserves [to Sunset] ... the exclusive hunting and fishing privileges on the *above described property....*" (emphasis added). The only "above described property" is the description, on pages one and two of the deed, of the entire tract of property conveyed. Not until after Sunset had reserved the exclusive hunting and fishing privileges to the entire tract conveyed is there any mention of the 3.03 acre tract of land. Unlike the first paragraph of page three of the deed which reserves the "exclusive *hunting and fishing privileges* " of the entire tract conveyed, the third paragraph reserves "exclusive *use* [of] the clubhouse at Brown Pond and also 3.03 acres of land described as follows...." (emphasis added). The court finds that the only paragraphs of the deed that relate solely to the 3.03 acres are the last three paragraphs of page three of the deed. The first of these three paragraphs contains the reservation and description of the clubhouse and 3.03 acres, the second requires Sunset to pay for insurance on the clubhouse and tenant house on the 3.03 acres, and the third paragraph repeats the reservation of exclusive use of the 3.03 acres and the houses located thereon.

This court finds that all remaining paragraphs, on pages four and five of the deed, which impose duties or confer rights relating to the property, clearly extended to the entire 1,500 acre tract. Although the provisions on pages four and five of the deed refer to and apply to the clubhouse and the 3.03 acre tract, they all also refer to additional locations separate from the 3.03 acre tract, or refer to "lakes." There are no "lakes" on the 3.03 acre tract.

Although this court finds the Lilly Deed to be clear and unambiguous as to the extent to which it confers rights and imposes duties upon the parties in relation to the tract of land, the court further finds that even if parts of the deed were to be found arguably ambiguous the court's interpretation would remain unchanged because when read as a whole, the intentions of the parties are evident. In *Cole v. Thrasher*, 246 Ga. 683, 272 S.E.2d 696 (1980), the court relied on O.C.G.A. § 44–6–21, in a deed construction case, in holding "[t]he terms of the whole instrument are to be construed together to give effect to the entire deed and to uphold the intention of the grantor." The cardinal rule in the construction of a deed is to ascertain the intention of the parties and a deed or other contract should be construed as a whole, and in its entirety, in order to find the true intention of the parties. *Skinner v. Bearden*, 77 Ga.App. 325, 48 S.E.2d 574 (1948).

The court will specifically address the second paragraph of page five of the deed which provides "that party of the first part may use wood from the lands described for clubhouse purposes ..." The reason for specifically addressing this paragraph is that it is the only paragraph, due to its lack of punctuation, that could reasonably be found ambiguous as to which of the legal descriptions it applies. After looking at the deed as a whole, the court finds that the intention of the parties was that Sunset's right to use wood from the lands extend to the entire 1,500 acre tract, but, subject to the restriction, that this wood must only be used for clubhouse purposes. Also, since the deed had already reserved "exclusive use" of the 3.03 acres, which would include the exclusive right to use wood from the 3.03 acres, this paragraph

would be mere surplusage if this court's interpretation was not the parties' intent.

II. The next issue to be addressed by the court is whether the Lilly Deed expressly limits the use of Sunset's interest to only its twenty-eight named members.

█ The second paragraph of the third page of the Lilly Deed states: "It is distinctly understood that party of the first part [Sunset] is a non-profit corporation with twenty-eight (28) shares of stock outstanding and party of the first part agrees that it will not increase its membership." Matera contends that this provision limits access to the property to the twenty-eight members individually. Matera contends that Sunset has violated this provision of the deed by allowing non-members to enter and use the property through "honorary membership"; by allowing entry by family, dependents, and friends of members; and by allowing use of the clubhouse and adjoining 3.03 acres by non-members for private business and entertainment purposes.

This paragraph clearly states that it is "distinctly understood" that the party of the first part (Sunset) is composed of twenty-eight shares of stock and "that it will not increase its membership." This court finds that the clear intent of the parties was that the club membership not be increased; therefore, Sunset must not side step this prohibition by granting "honorary memberships." Matera cites two cases from foreign jurisdictions which illustrate instances where courts have placed limits on the use of hunting and fishing rights. *Bland Lake Fishing and Hunting Club v. Fisher*, 311 S.W.2d 710 (1958) (original stockholders could assign, but could not further subdivide the right to hunt and fish); *Bingham v. Salene*, 15 Or. 208, 14 P. 523 (1910) (holders of hunting rights may sell and assign their right, but may not indiscriminately give numerous passes and permits to others). In the absence of any Georgia case law on point, Matera relies on *Bingham* and *Bland Lake;* however, neither case deals with the issue of invited guests, but rather with the issues of the indiscriminate giving of numerous passes

and permits, and the enlargement of membership, respectively.

Although the second paragraph of the third page of the deed prohibits Sunset from increasing its membership, it does not go so far as to prohibit use of the property by members' families, dependents, or accompanied guests. One only needs to look to the last sentence of the preceding paragraph, which states "[t]he Grantee ..., unless he belongs to said Club, shall have no right to fish or hunt on said property *or invite any person* to hunt or fish on said property," to see that it was the intent of the parties that club members have the right to invite guests (emphasis added). Matera's claim that Sunset seeks to expand its privileges and increase the burden on the fee by allowing use by family members and accompanied guests is groundless in light of the fact that the right to invite guests is contemplated in the deed and has existed all along. Paragraph five of page five does not limit Sunset's right to invite guests; it just emphasizes that all hunting and fishing rights are vested in Sunset and that none remain in anyone else.

█ Sunset's interest in the clubhouse at Brown Pond and the 3.03 acres on which it is located is an "estate for years." O.C.G.A. § 44–6–100. An estate for years carries with it the right to use the property in as absolute a manner as may be done with a greater estate, provided that the property or the person who is entitled to the remainder interest is not injured by such use. O.C.G.A. § 44–6–103. The Lilly Deed reserves to Sunset "exclusive use" of the clubhouse and 3.03 acres. The deed mentions no limitation on this "exclusive use" other than the requirement that Sunset pay for insurance on the clubhouse and tenant house. Therefore, Sunset may put this parcel to any use so long as such use does not constitute a waste or dissipation of the remainder.

III. The next issue the court will address is whether the reservations and obligations set forth in the deed, incident to the reservation of hunting and fishing rights and exclusive use of the clubhouse parcel, constitute "covenants restricting

lands to certain uses" which will cease to be enforceable in September, 1992, by operation of O.C.G.A. § 44–5–60(b). Matera contends that O.C.G.A. § 44–5–60(b) which provides that "covenants restricting lands to certain uses shall not run for more than 20 years ... in counties for which zoning laws have been adopted" will render these interests of Sunset unenforceable.

■ This court finds that O.C.G.A. § 44–5–60(b) will not render any of Sunset's rights or interests unenforceable. This code section, as stated above, applies to "covenants restricting lands to *certain uses*...." (emphasis added). The Lilly Deed contains no language which states that the fee owner must use the land only for any particular uses. In fact, Matera may put this land to any use whatsoever as long as it does not violate Sunset's rights under the deed.

The scope of O.C.G.A. § 44–5–60(b) is meant to apply to both "use restrictions" and, further, to "building restrictions" as these appear in restrictive covenants because both restrictive covenants and zoning ordinances contain building and use restrictions. *Payne v. Borkat*, 244 Ga. 615, 261 S.E.2d 393 (1979). Also, although O.C.G.A. § 44–5–60(b) deals with use restrictions, it does not affect easements. *Hendley v. Overstreet*, 253 Ga. 136, 318 S.E.2d 55 (1984). Therefore, in addition to the fact that there is no provision restricting the land to "certain uses," any easements and negative easements created by the deed would also be excepted from application of the statute under the reasoning of *Hendley*.

Matera cites *Moreland v. Henson*, 256 Ga. 685, 353 S.E.2d 181 (1987) in which the court was called upon to determine whether the intent of a grantor of a deed was to create easements or restrictive covenants. The court quoted a portion of the deed which stated "[s]aid land is sold and conveyed subject to the following restrictions ..." and found that "[t]he presence of the word 'restrictions' was an indication of the intent of the grantor to restrict the use of the property rather than to grant an easement." The court, quoting additional language of the deed, stated: "The conveyance restricted the use of the property to 'community recreation and residential purposes only.'"

The language in the Moreland Deed restricting the use of the property to "community recreation and residential purposes only" clearly creates a restrictive covenant "restricting lands to certain uses" as contemplated by O.C.G.A. § 44–5–60(b). Although the deed in *Moreland* clearly, specifically restricts use of the land to 'certain uses,' the Lilly Deed is distinguishable in that it contains no such restriction to certain uses at all.

For the reasons discussed above, this court finds that O.C.G.A. § 44–5–60(b) does not apply to affect any of Sunset's rights under the Lilly Deed.

IV. The court will now address the issue of whether Sunset's rights under the Lilly Deed preclude Matera's good faith development of its 1,500 acres.

■ In *Bosworth v. Nelson*, 170 Ga. 279, 152 S.E. 575 (1930), the Georgia Supreme Court interpreted a deed in which the grantors reserved exclusive fishing privileges upon all of the land conveyed. The court held that the reservation created rights to *"profits a prendre*, which consists of a right to take a part of the soil or produce of the land in which there is a supposable value. Such a right is considered an interest or estate in the land itself...." The interest created when Sunset reserved the exclusive hunting and fishing rights to the land conveyed by the Lilly Deed is the right to *profits a prendre*, as is the right to use wood from the lands conveyed. However, the right to use wood is limited by the requirement that it be used only for clubhouse purposes.

The reservation of rights to *profits a prendre* alone will not prevent the owner of the land from making good faith use of the land, even if this good faith use harms the subject matter of the reservation. Both Matera and Sunset cite the recent Georgia case of *Abernathy v. Georgia Kraft Co.*, 257 Ga. 821, 364 S.E.2d 851 (1988) which held:

The right of hunting on another's lands or waters may be acquired ... with such restrictions or limitations as the owner may see fit to impose.... In the absence of express restrictions the grantor, if he acts in good faith, may do any act of husbandry, although it injures the hunting, but he is liable in damages to the owner of the hunting privilege if he does such acts in bad faith.

Both parties also cite the Iowa case of *Mikesh v. Peters*, 284 N.W.2d 215 (1979), which dealt with the issue of to what extent, if any, can the reservation of recreational rights, including hunting and fishing rights, limit the activity of the landowner on his property. The Iowa court held that "hunting rights do not limit the landowner in his or her use of the affected land absent an express covenant to the contrary...." The court also held "the party reserving or obtaining a grant of such rights may reserve or contract for the preservation of present conditions as well."

It is clear that under Georgia law, as stated in *Abernathy*, that the reservation of a *profit a prendre* alone will not prevent the landowner from doing any good faith act of husbandry on his land. It is also clear that hunting rights on the lands of another may be acquired with such limitations or restrictions as the owner may see fit to impose. Matera is correct in its assertion that Sunset did not contract for the preservation of the then existing conditions of the entire 1,500 acres. However, the Lilly Deed does contain some contractual rights and duties which act as limitations on Matera's good faith acts of husbandry.

These rights and duties and limitations are set forth on pages four and five of the Lilly Deed. The court will discuss the limitations as they concern the land separately from those concerning protection of the lakes, although both categories will affect Matera's use and development of the land.

Matera is precluded from putting the 3.03 acre clubhouse tract, in which Sunset has an estate for years, to any use of its own because Sunset has exclusive use of this tract. Other than the contractual obligations concerning the protection of the lakes, the only limitations on Matera's good faith acts of husbandry toward the rest of the land are the requirements that Matera "keep the roads and gates now running to the Club House, Brown Pond, Little Brown Pond and Fly Pond open and useable at all times," that Matera "not run any pond off on said property," and that Matera allow Sunset to enjoy the easement of "ingress and egress into and over said property to any of the lakes on said property or to any place to hunt." Initially, it seems as long as Matera complies with these requirements and acts in good faith it may do any act of husbandry even though it injures the hunting; however, Matera is subject to the further requirements that these acts do not damage any of the lakes on the property or offend any of the contractual provisions concerning protection of the lakes.

Although Matera, through good faith acts of husbandry, may injure or even completely destroy the hunting as it concerns the land itself, these acts are subject to the further requirement that they not damage the lakes or breach any of the other provisions in the deed dealing with protection of the lakes. This is because the Lilly Deed expressly protects the lakes from damage "in any way." In *Abernathy*, the Supreme Court of Georgia held that, in order to protect a *profit a prendre*, an agreement must contain express restrictions or limitations. Otherwise the landowner is only limited by the requirement that his acts be in good faith. In *Abernathy* there was nothing in the agreement granting hunting rights which prohibited the landowner from doing any good faith acts which might injure the hunting.

In the Lilly Deed there is an express agreement prohibiting Matera from running any pond off on the property or from doing "any damage to any of the lakes on said property in any way." This is exactly the kind of express restriction the *Abernathy* and *Mikesh* decisions say must exist in order to protect a *profit a prendre*. Therefore, Matera is precluded from doing any act, whether on the lakes themselves or on any of the surrounding land, which causes damage, in any way at all, to any of

the lakes. This is so even if such acts are done in good faith.

The main issue here is whether Matera may develop the 1,500 acres in question. Both parties agree that the law is clear that the existence of a *profit a prendre* alone will not preclude any good faith use of property by the owner of the fee. However, both the *Abernathy* case in Georgia and the *Mikesh* case from Iowa recognize that a *profit a prendre* may be protected by the inclusion of express covenants, restrictions, or limitations. The Lilly Deed not only contains an express prohibition of any damage to the lakes, but it also sets forth certain rights and duties for the purpose of protecting the lakes. Sunset has the right to maintain fences around Brown Pond and Little Brown Pond, and Matera has the duty to cooperate with Sunset in maintaining the fences. Matera also has the affirmative duty to terrace the land around Little Brown and Brown Lake and to keep the land terraced "so that the lands will not wash into the Lakes and Club."

The Lilly Deed conveyed the described premises in fee simple "subject to the restrictions herein enumerated." (Lilly Deed, pages 5 and 6). Therefore, the deed passed to the purchaser all interests except those reserved by Sunset, subject to any rights created and duties imposed by the deed. The deed did not reserve to Sunset the right to develop the land, so this right passed to the purchaser. There are no express provisions in the deed prohibiting development; however, there are certain provisions which may have an effect on certain types of development.

As the parties stand now, Matera has the right to develop the property; however, any development must be done in good faith and is further subject to the easements, provisions, and limitations set forth in the deed. However, even if it acts in good faith Matera may not develop the property in any way that will directly harm or have the effect of harming any of the lakes in any way, or in any way that will interfere with Sunset's use of its easements or exercise of its contract rights.

The deed prohibits "any damage to any of the lakes on said property in any way." This is a broad and all encompassing prohibition. Under the wording of this phrase, damage to the lakes could be found in a number of ways. "[A]ny damage" would include not only physical damage to the lake itself, but would include any damage to the plant and animal life in and immediately around the lake. Also, "any damage" could include damage to the natural beauty of the lake or even damage to Sunset's ability to use and enjoy the lake for the purposes reserved and contracted for in the deed.

Whether Matera's proposed development is prohibited by the terms of the Lilly Deed is a question of fact, not proper for the court to decide. Certain types of development might be acceptable while others would not. It is entirely possible that certain portions of the land may be developed while other portions such as those in close proximity to the lakes may not. Because Sunset saw fit to contractually protect their interests, unlike the plaintiffs in *Abernathy* and *Mikesh*, any development of this property is subject not only to the "good faith" requirement, but also to additional requirements set forth above.

V. The final issue this court will address is what respective rights do Matera and Sunset have to use the surface of the waters above the lake beds on the premises. More specifically, the issue is whether Matera, as owner of the lake beds, may exercise all water surface rights other than fishing, and whether Sunset may, in conjunction with its fishing rights, boat on the waters and maintain fish management projects.

Matera's contention that it has the right to exercise all water surface rights not reserved to Sunset is correct. Under Georgia law the owner of the bed of a non-navigable lake has the exclusive right to the use of the surface waters above the bed. *Georgia Power Co. v. Baker*, 830 F.2d 163 (11th Cir.1987). However, Matera's exercise of its water surface rights is subject to the same limitations as those that apply to development, which are set

forth above. Matera is precluded from exercising its surface rights in any manner ' that will cause damage to the lakes, even if it does so while acting in good faith.

In *Bosworth v. Nelson,* 170 Ga. 279, 152 S.E. 575 (1930), Nelson reserved exclusive boating and fishing privileges on the waters of land he and his mother conveyed. Bosworth acquired title to some of this waterfront property and developed it and began to sell swimming and diving permits to the general public. Although Nelson had not reserved the rights to swimming and diving, the Supreme Court of Georgia enjoined Bosworth from selling the permits because they were "being exercised in a boisterous, clamorous, and noisy manner, [which] interferes with his [Nelson's] quiet and peaceful use and enjoyment of his boating and fishing privileges." Likewise, Matera may not exercise its surface rights in such a "boisterous, clamorous, and noisy manner" as to interfere with the quiet and peaceful use and enjoyment of Sunset's rights.

Matera must allow Sunset to exercise its hunting and fishing rights as long as those rights exist. In the exercise of these rights, Sunset is entitled to boat on the waters of the property conveyed by the Lilly Deed to the extent necessary to exercise its hunting and fishing rights. In *Salene v. Isherwood,* 55 Or. 263, 106 P. 18 (1910), the grantee of hunting rights was held to have the right to maintain small boats and temporary structures to the extent essential to the successful exercise of their bird hunting rights. Here, Sunset's right to boat is limited to that necessary to the exercise of its hunting and fishing rights and does not include the right to other recreational forms of boating, water skiing, or swimming.

In *Council v. Sanderlin,* 183 N.C. 253, 111 S.E. 365, 368 (1922), the owner of hunting privileges was held to have the right and power to protect the game "except [from] such injury thereto as may be caused by the owner in the use of said land for purposes other than hunting." *Salene v. Isherwood* held that where natural food for waterfowl had disappeared, the grantee

of hunting rights had the right to feed the birds. In the absence of relevant case law from Georgia, the court relies on these two cases in ruling that Sunset may maintain fish management projects in the waters conveyed by the Lilly Deed to the extent these projects do not interfere with Matera's exercise of its surface rights upon the lakes, and do not cause damage to the realty itself.

In conclusion, this court has determined that the Lilly Deed reserves hunting and fishing rights in the entire 1,500 acres in question, and that the deed does not limit the use of this interest only to the twenty-eight named members. In this regard, Sunset may not issue passes or permits, but may extend use to immediate family, dependents, and accompanied guests. Sunset has the right to exclusive use of the 3.03 acre clubhouse parcel and may put it to any use, including social and entertainment uses, as long as such use does not constitute a waste or dissipation of the remainder. This court finds that O.C.G.A. § 44–5–60(b) simply does not apply to any of the rights and interests reserved by the Lilly Deed. The court also finds that in using the land in ways that will not have the effect of damaging any of the lakes or interfering with Sunset's use of its easements, Matera is limited by good faith. However, Matera is strictly prohibited from using the land in any way that will damage any of the lakes in any way or interfere with Sunset's use of its easements, even if Matera acts in good faith. With regard to water surface rights of each of the parties, these are set out in part V of this order.

## APPENDIX *A*

GEORGIA, LOWNDES COUNTY.

THIS INDENTURE, made and entered into on this the 14th day of May, 1945, by and between *Sunset Lake Fishing and Hunting Club,* a corporation of said County and State, as party of the first part, and *P.R. Lilly,* of Lowndes County, Georgia, as party of the second part,

WITNESSETH:

That the said party of the first part for and in consideration of the sum of *Twenty-*

*five Thousand Eight Hundred and Forty ($25,840.00),* Dollars, in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed and by these presents does grant, bargain, sell and convey unto the said party of the second part, his heirs and assigns, subject to the restrictions herein set forth, the following described property, to-wit:

All that tract or parcel of land situated, lying and being in the Sixteenth Land District of Lowndes County, Georgia, and described as follows:

All of lots numbers one hundred and nineteen (119), one hundred and twenty (120), one hundred and twenty-one (121), one hundred and twenty-two (122) and all of lot one hundred and fifty-seven (157), except sixty-five (65) acres, more or less, on the South side of said lot sold to Robert Peterson on the 4th day of August, 1915, and all of lot one hundred and fifty-six (156), except a certain strip of land beginning at the south-east corner of lot of land number one hundred fifty-six (156) and running North the original line .210 feet, thence east of equal width to the public road from Lake Park to Belleville, via Lake Aloyon. All of said land lying in a body and containing in the aggregate twenty-eight hundred and thirteen (2813) acres, more or less, and being what is commonly known and called the "West Plantation."

Also all that tract or parcel of land situated, lying and being in Lowndes County, Georgia, and further described as follows: A strip or parcel of land commencing on the West side of public road leading from Valdosta and Lake Park to Lake Alcyon and Belleville, Florida, where the land line crosses said road between the lands of the West Plantation, and the Moseley Plantation, and running North one acre deep, thence running West parallel with said land line one acre deep at all points, except as hereinafter stated, to the West original land line of lots of land numbers 109 and 110. Where said land line reaches Fly Pond the same will curve slightly to the right of North around the curvature of said pond, so as to afford ground for wagon road around said pond. The said strip being bounded on the East by Public road, on the North by land of Mrs. Stump, on the West by the original land line of lot No. 110, and on the South by lands of Mrs. W.S. West and her son William Stanley West, and being parts of lots of land numbers one hundred and nine (109) and one hundred and ten (110) in the 16th District of said County and State.

Reference is hereby made to that certain warranty deed from Mrs. W.S. West and W.S. West to Sunset Lake Fishing and Hunting Club, recorded in Book 3–P, page 360, records Lowndes County, Georgia.

The property above described is deeded subject to that certain deed from the Party of the first part to United States of America, recorded in Deed Book 3–Q, pages 179–180–181, records Lowndes County, Georgia, and also subject to that certain agreement recorded in Deed Record Book 4–J, page 226, Lowndes County, Georgia, records.

Parties hereto agree that the annual rental on the oil and gas lease shall go to party of the second part but it is distinctly understood and agreed that if oil, gas, minerals or any other substance is found on said land that are covered by the lease dated September 16th, 1943, then the amount received as royalty shall be divided equally between the party of the first part and party of the second part, his heirs and assigns. The lease referred to is dated September 16th, 1943, and recorded in the Clerk's office of the Superior Court of Lowndes County, Georgia, and is between party of the first part and The Humble Oil and Refining Company of Georgia. The annual rentals shall go to party of the second part his heirs and assigns. Party of the first part reserves for itself, it's successors and assigns one-half of any royalty received on account of oil, gas, minerals or any other substance that may be found on or under said land during the ninety-nine year lease. If any future lease is executed then party of the second part shall get the rentals but party of the first part shall retain fifty percent, of any proceeds arising

from royalty on account of any gas, oil, minerals or any other substance found.

Party of the First Part reserves for itself and members of Sunset Lake Fishing and Hunting Club the exclusive hunting and fishing privileges on the above described property for a period of ninety-nine (99) years from this date. The Grantee his heirs and assigns, unless he belongs to said Club shall have no right to fish or hunt on said property or invite any person to hunt or fish on said property.

It is distinctly understood that party of the first part is a non-profit corporation with twenty-eight (28) shares of stock outstanding and party of the first part agrees that it will not increase its membership.

It is understood and agreed between the parties hereto that party of the first part is reserving for its exclusive use the club house at Brown Pond and also 3.03 acres of land described as follows:

A certain tract or parcel of land lying and being in the 16th land district of Lowndes County, Georgia, and being a portion of the lands now owned by Sunset Lake Fishing and Hunting Club and containing 3.03 acres, and described as follows: Beginning at an iron pipe at the waters edge on the east side of Brown Pond and running in an easterly direction a distance of four hundred and fifty (450) feet to an iron pipe, thence in a southerly direction a distance of three hundred and fifty (350) feet to an iron pipe, thence in a westerly direction to the water's edge of Brown Pond a distance of three hundred eighty-eight (388) feet, thence in a northerly direction along the east bank of Brown Pond a distance of two hundred and eighty (280) feet to the point of beginning, according to a survey made by G.I. Tillman, C.E., on May 11, 1945, and there being located on said tract the Brown Pond Club House, one tenant house and a boat house.

Party of the first part will pay the insurance on the Club House and the little tenant house.

Party of the first part reserves this property for the period of ninety-nine (99) years and shall have exclusive use of the houses and the premises.

Party of the second part agrees and warrants to Party of the first part that he will keep the roads and gates now running to the Club House, Brown Pond, Little Brown Pond and Fly Pond open and usable at all times for the use of members of the Club.

Party of the Second part agrees and warrants to Party of the First Part that he will terrace the land around Little Brown and Brown Lake so that the lands will not wash into the Lakes and Club and he will keep the lands terraced during the ninety-nine (99) year lease.

Party of the second part agrees and warrants that he will not run any pond off on said property or do any damage to any of the lakes on said property in any way.

If Party of the second part, his heirs or assigns, shall fail to terrace the land, keep roads open and usable to Fly Pond, Little Brown Pond and Brown Pond or should fail to cut a road when requested so to do by the President of the Club to Fly Pond, if another road is desirable, or should party of the second part, his heirs and assigns, shall fail to keep any of the restrictions set out in this deed then party of the first part may give to party of the second part, his heirs and assigns, notice of what should be done and said notice shall specify the restrictions violated and party of the second part, his heirs or assigns, must be notified sixty days and then upon failure of party of the second part to remedy the matter in question party of the first part may and shall have the right to do the necessary repairing, fixing the roads, terracing or to do any and all other things relative to all the restrictions in said deed and party of the second part, his heirs and assigns, shall immediately pay to party of the first part the amount advanced and spent and said amount shall be treated as an open account and shall draw interest from the time said amount is rendered at the rate of seven per centum per annum.

Party of the second part gives to the party of the first part for the lease period of ninety-nine (99) years ingress and egress into and over said property to any of the

lakes on said property or to any place to hunt and will at his own expense keep the roads in a usable condition.

Party of the second part agrees and warrants that party of the first part may use wood from the lands described for club house purposes during the life of this lease.

Party of the second part agrees that party of the first part shall have the right to maintain the fence around Brown Pond and shall further have the right to fence Little Brown Pond.

Party of the second part agrees to cooperate with party of the first part in keeping the fences up around the lakes.

It is distinctly understood and agreed between the parties hereto that party of the first part is reserving for itself, it's successors and assigns the exclusive right to hunt and fish on said property and no other person or persons shall have any right to hunt or fish on said property during the time that party of the first part has reserved, to-wit; ninety-nine years.

It is understood and agreed between the parties hereto that party of the second part is a member of the Club owned by party of the first part.

This deed is given subject to a lease in favor of W.D. Martin expiring January 1, 1947. The rent for this year is to be pro-rated and Grantee is to have the rentals on said lease hereafter.

Party of the first part is selling subject to the restrictions herein enumerated all of the land belonging to party of the first part totalling Two Thousand Five Hundred and eighty-four (2,584) acres, more or less. Said land is not being sold by the acre.

TO HAVE AND TO HOLD, the said bargained premises, together with all and singular the rights, members and appurtenances thereof to the same being, belonging, or in anywise appertaining to the only proper use, benefit and behoof of him, the said party of the second part, his heirs and assigns, in fee simple.

And the said party of the first part, it's successors and assigns, the said bargained premises unto the said party of the second part, his heirs and assigns, against the said party of the first part, it's successors and assigns, and all persons whosoever, shall and will warrant and forever defend by virtue of these presents.

IN WITNESS WHEREOF, the said party of the first part has caused these presents to be executed for it and on it's behalf by it's President and to be attested by it's Secretary and it's Corporate seal to be hereunto affixed, on the day and year first above written.

GEORGIA, LOWNDES COUNTY.
Signed, sealed and delivered
by J.L. Giddens, President
in the presence of:
(s) Inez J. Metcalf

(s) Evelyn M. Rountree

NOTARY PUBLIC
GEORGIA, DOUGHERTY COUNTY.
Signed, sealed and delivered by
F.L. Beddingfield, Secretary
in the presence of:
(s) N.J. Adams

(s) Randolph Thornton

NOTARY PUBLIC

SUNSET LAKE FISHING AND HUNTING CLUB

BY: (s) J.L. Giddens

PRESIDENT

ATTEST: (s) F.L. Beddingfield

SECRETARY.